### DORRINGTON v. CITY OF DETROIT.

(Circuit Court of Appeals, Sixth Circuit. April 6, 1915.)

No. 2574.

1. SALVAGE ⊙⟲22—LIABILITY OF SALVORS FOR NEGLIGENCE OR WANT OF SKILL.

Persons undertaking a salvage service are bound to exercise reasonable care and such skill as persons performing such services ordinarily possess, especially where competent assistance is at hand; and where through their negligence or want of such skill injury results to the vessel they are attempting to assist, they may not only forfeit all right of salvage, but may render the salving vessel liable for damages, whether or not their efforts are successful.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 52; Dec. Dig. ⊙⟲22.]

2. SALVAGE ⊙⟲22—UNSUCCESSFUL SERVICES—LIABILITY OF SALVORS.

When liability is sought to be fastened on a salving vessel solely because the attempted service was ineffectual, no independent injury having been caused by the salvor, there is no responsibility if the service was rendered in good faith, without clear evidence of culpable negligence or willful misconduct.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 52; Dec. Dig. ⊙⟲22.]

3. ADMIRALTY ⊙⟲19—JURISDICTION—MARITIME TORTS.

A court of admiralty has jurisdiction of a suit to recover damages for injury to a vessel in navigable waters caused by the negligent management of a drawbridge over such waters.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 233, 234; Dec. Dig. ⊙⟲19.]

4. NAVIGABLE WATERS ⊙⟲20—DRAWBRIDGES—LIABILITY FOR NEGLIGENT OPERATION.

A city which maintains a drawbridge over a navigable stream may be held liable in admiralty, regardless of state statutes, for injury to a vessel caused by negligence in the discharge of their duties of those to whom it has intrusted the management of the bridge.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. ⊙⟲20.]

5. NAVIGABLE WATERS ⊙⟲20—DRAWBRIDGE—NEGLIGENT OPERATION—LIABILITY FOR INJURY TO VESSEL.

A schooner anchored in the river at Detroit dragged her anchors during a high wind and drifted slowly northeastward toward the Belle Isle

drawbridge, maintained by the city across the American channel. A fire boat maintained by the city was sent to her assistance, but the fastenings of the towing cable twice broke, the last time leaving the schooner opposite and near the draw of the bridge, and the fire boat then signaled for the opening of the draw. The assistant engineer in charge of the draw refused to open it because of the high wind, but it appeared from the evidence that it could have been safely done, and would have been if the chief engineer had been present. The schooner drifted against the draw and was practically wrecked. *Held*, that under Act March 23, 1906, c. 1130, § 4, 34 Stat. 85 (Comp. St. 1913, § 9964), which provides that if such a bridge "shall be constructed with a draw then the draw shall be opened promptly by the persons owning or operating such bridge, upon reasonable signal, for the passage of boats and other water craft," the city had the burden of showing that the violation of the express requirement of the statute, not only did not contribute to the injury of the schooner, but could not have done so, and that, having failed to sustain such burden, it was liable for such injury.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 73–99; Dec. Dig. ☞20.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty by John J. Dorrington against the City of Detroit. Decree for respondent, and libelant appeals. Reversed.

The libelant and appellant, Dorrington, owned the Maria Martin, a three-masted schooner, built in 1866. She was well built and well rigged; had been an important sailing vessel on the lakes, and was known in her prime as the "Pride of the Lakes.' She was 175 feet long and 35 feet at the beam; drew 5 to 6 feet light and 14½ feet loaded. Dorrington had owned her a number of years prior to November 21, 1906, and in the year 1899 she had earned $5,000 net, but for the succeeding five or six years she had earned practically nothing, the owner intending to convert her into a steamship, but was not able to do so through lack of means. Within a few months from November 21, 1906, he had refused separate offers of $6,000 and $6,500, which were regarded by apparently competent witnesses as cheap figures.

During the five years in which she was practically out of commission, she lay at anchor in one place or another in the Detroit river at Detroit, and on the day named was held by two anchors, one of 1,800 pounds, the other of 2,000 pounds, to which were attached iron chains 360 feet long. On that day Dorrington was on board, and at some time after noon a southwest wind arose, which, by 4 o'clock, had developed into a gale which caused the ship to drag her anchors. Her anchorage was about one-half mile from, and about southwest of, the Belle Isle bridge, owned and constructed by the city of Detroit under the supervision of the Secretary of War, leading from the city across the American channel to Belle Isle, one of the city's parks. The American channel of the river is about northeast and southwest, the water flowing southwestwardly. The bridge lies northwest by north and southwest by south, and for present purposes may be described as having three piers, the distance between the middle pier and each of the other two being about 160 feet. The bridge had a draw 318 to 320 feet in length, resting at its center, and swung upon the middle pier, which had an extension southwestwardly of 160 feet, so that when the draw was swung one end of it stood over the end of the middle pier which, in the testimony, is called the "crib," the "cradle" and sometimes the "bridge." The machinery for turning the draw and the men in charge were housed at the center of the draw over the crib upon which the draw rested and turned on rollers when opening. So, when the bridge was opened, there were passageways for boats, one on each side of the crib, and each about 160 feet in width, the depth of the water being about 20 feet. On or in the bottom of the river from the city to the island there was an eight-inch pipe carrying water from the city to the

island. The bridge was in charge of a chief engineer and two assistants, but on the day mentioned one Martin, an assistant engineer, was in charge, and under him, two gatemen who did not have anything to do with the management of the draw. Martin had been assistant engineer for about a year, and had had no previous experience in the handling of drawbridges. According to him, the engine operating the draw was of 40 horse power. The chief engineer makes it about 20 horse power. Ordinarily 2 horse power would turn the draw. The machinery was appropriate for the kind of work it was called on to do, answered the purpose very well, and was an oscillating engine, working either way according to the way in which the steam was introduced. The speed was regulated by the amount of steam introduced and by reversing the engine. From all the testimony it may be gathered that the machinery was adequate to swing and handle the draw in a high wind or gale. There was no apparatus on the bridge for determining the velocity of the wind, which the assistant engineer said was, on that day, about 50 miles an hour; and there was other evidence tending to show that it was from 55 to 60 miles an hour. The chief engineer was not on the bridge that afternoon, and did not know an unusual wind was blowing. A 50-mile gale was not unusual in November.

The ship was drifting upstream and toward the bridge. Probably, if her course had not been changed by what took place, she would have struck the south pier, or not far to the right of that, at the bridge extending from the south pier to the island. When the ship began to drift, Dorrington, who was an experienced navigator, thinking it best to seek help, got into his skiff and pulled to Detroit for that purpose. He called on the telephone a company owning tugs, and learned that he could get but one tug, which was the only available tug in the harbor. The ship continued to drift, and the city authorities ordered the fire boat Elliott to take charge of her. It may be gathered from the testimony of the captain of the Elliott that the primary purpose was to prevent damage to the bridge, and it appears that he did not regard the ship as being of any value because of her age. He said she had lain so long in the roadway that she had become a "joke," and that from time to time when his boat passed her, as she lay at anchor, rotten wood would be churned out of her hull by the waves made by his boat. He afterwards said he was so told. There is nothing in the evidence to indicate that the ship was in so desperate a condition of decay as that, and the captain's further statement that he was afraid of walking on the deck lest he might go through was not warranted by anything in the testimony. The only time he was on her deck was just before dark, and before he left darkness had set in, as will appear.

The Elliott left her moorings at 4:45 p. m., and the ship struck the crib at about 5:15. It is uncertain how long the Elliott was engaged in attempting to prevent the ship from striking the bridge, for the time varies in the testimony from half an hour to five minutes. The ship was drifting sternway upstream and going toward the bridge. She was going slowly, the evidence fairly disclosing that it took about two hours for her to drift from her anchorage to the crib of the bridge. That would be about 22 feet a minute. Primarily the Elliott was not a tug, nor was it her duty ordinarily to tow vessels. Her crew consisted of seven men, none of whom, excepting the pilot, being seamen. They were firemen. She was in charge of a captain and managed by the pilot, who took her wherever the captain directed. The Elliott overtook the drifting ship at a point about 500 feet southeast of the crib, coming up on the starboard, aft. The sea was high, the waves running as much as four feet, which was unusual. The captain and another jumped aboard the ship and carried, or there was thrown, from the fire boat, a heaving line attached to a hawser, which the captain or his assistant attached to some post, whether a tow post, or a quarter post, or a cleat, does not clearly appear. At any rate, when the fire boat started to pull the stern of the ship around, that is to say, northwardly, the hawser came away. Thereupon the captain and his assistant hauled it back to the ship and there fastened it, probably to a quarter post used for light towing when the strain is fore and aft, which was not, however, suitable for such a side strain, as was necessarily imposed upon it by the effort of the fire boat to haul the

stern of the ship around. There were two tow posts located just forward of the cabin, and at perhaps one-third of the length of the ship from the stern. These tow posts went through to the keelson, and were anchored there. The quarter posts were further toward the stern, and nearer the gunwale of the ship. They went through, too, to the skin of the vessel, but were only anchored by heavy bolts going through the heavy beam running transversely of the vessel and on which the deck rested. It is probable that on the second attempt to fasten the hawser the quarter post came away under the strain. Dorrington described it as having been "pulled out by the roots." The captain of the Elliott said the post he fastened to, whatever it was, was rotten. It is here found that skillful seamen, accustomed to towing vessels, would not ordinarily hitch to such a quarter post in order to pull a vessel around. When the second attempt was made the ship was about 10 feet from the end of, and toward the south of, the crib. These two attempts to pull the stern around had been, to some extent, successful. The ship had been brought around so as to present her side to the wind, which caused her to lie somewhat broadside to the bridge, the draw not having been opened. She struck first at the stern, aft, and, according to one witness, the assistant engineer, 25 to 50 feet from the end of the crib, and her stern chewed along the crib while her jib-boom struck the railing of the bridge. It broke, as did also other masts, spars, and yards, which came tumbling to the deck, whereupon the captain and his assistant jumped onto the crib and called to or motioned the fire boat to go home, which it did. In the meantime, the only tug (the Lorimer) available to assist in the rescue had been sent out by its owner, at Dorrington's request, for the purpose, and reached the scene at about the time the second attempt of the fire boat was being made. There is uncertainty as to the length of time the Lorimer was there. Her captain saw the two men on board the ship and the efforts of the fire boat to prevent the ship's striking the crib, and, thinking they could take care of her, went away for the purpose of assisting another vessel, which had slipped its moorings and to whose assistance also he had been sent.

The Elliott was a powerful boat owned by the city of Detroit, and was used for the purpose of putting out fires at the docks and property near by, or upon vessels, and was well equipped with tow lines and other apparatus suitable for towing vessels. She was a much more powerful boat than the Lorimer, whose captain testified, however, that he could have pulled the ship out of danger. The captain of the fire boat says the Lorimer came within 50 feet of the ship, or maybe 100 feet from her bow, or 125 to 150 feet from his boat, while he was on the ship, and he did not signal for her assistance. He said he thought the ship would sink, and for that reason made no further effort that night to haul her away. The captain of the Lorimer said he got there between 4:30 and 5:00 o'clock, and was there probably 10 minutes. The ship's stern was pounding against the crib, and her rigging was going to pieces through contact with the unopened draw.

In the meantime no attempt was made by the assistant engineer to open the draw. He had for a long time seen the ship drifting toward the bridge. Three whistles were blown by the fire boat, but he did not open the draw. The captain of the Lorimer testified: "I was there 10 minutes any way. I don't know of any reason why the draw should not have been opened if a boat should blow for it. I heard three whistles blown. That is a recognized signal to open the bridge. There was nothing in the position of the Martin at that time which prevented the draw from being opened. They could have swung the bridge free from the vessel."

Dorrington had gone with his skiff to the dock at or near the Detroit end of the bridge, and testified: "When the fire boat was alongside trying to get a line on the Maria Martin at the foot of this center pier under the draw of the bridge, there was no reason why the draw of the bridge could not open. They could swing that bridge either way before a vessel got up there. At that time they could have swung the bridge the opposite way around, and left that south opening of the draw clear. That could have been done even when she drifted up against the bridge. They could have swung that bridge at any time until after the spars and rigging fell over."

The assistant engineer testified: "With the position of the Maria Martin

lying up against the cradle of the bridge it was not possible to open it. We could have swung away from it if there had not been any wind. The fire-tug Elliott had hold of the stern of the Martin when she came up near the bridge. The fire-tug Elliott didn't lay near the bridge. The firemen tried to get on it, but they could not, nor could I have safely swung the bridge. If we swung the bridge to the right, it would have hit the Maria Martin and struck her rigging, and if the bridge had been swung in the other direction it would have hit the fire-tug or her smoke stack. I could not swing it either way; it would have been apt to spin; I could not swing it in that wind. In a 50-mile wind it is not safe to swing the bridge in either direction, and that is due to the fact that I hadn't any brake on it."

He said: "It is not safe to open the draw in a gale of that kind. We have no brackets or brakes on when the bridge is ready to be opened and the wind takes hold of it and starts it right around and we can't stop it. If the draw were open in a 50-mile wind, it would be apt to spin the draw. Q. Now, Mr. Martin, do you mean to say that in a 50-mile gale that wind would twist the bridge around? A. Yes, sir. Q. Don't you know as a matter of fact, Mr. Martin, that that bridge has been turned in a 50-mile gale a good many times? A. No, sir; I don't. Q. It is customary about November in the fall of the year to have gales, is it not? A. Yes, sir. Q. And a 50-mile gale is not an unusual gale at that time of the year is it? A. No, it is not. Q. And that bridge has been operated for a number of years has it not? A. Yes, sir. Q. Did you ever have any other experience on a bridge before 1905 when you were employed there? A. No. * *. * Q. What has been your experience; have you ever refused to turn her in a 25-mile gale? A. I would not say it was blowing 25 miles an hour if I refused to turn her; it might have been blowing 45. Q. Was that the smallest wind at which you ever refused to turn her, 45 miles an hour? A. I would not say. Q. Have you ever refused to turn her? A. Yes, sir. Q. In how heavy a wind have you refused to turn her? A. I should judge it would be about 45 miles an hour. Q. That is the only wind you refused to turn her in? A. That is the only time a boat has asked for passage when the wind is blowing strong. Up to the time of this accident I had never refused to turn the bridge for any other boat except the Maria Martin. I had never seen that bridge in operation in a 45-mile wind before that. Q. Then why did you refuse to turn the bridge in that wind? A. Because it was dangerous to swing it. Q. Why was it dangerous for you to swing her? A. There was no way of holding it. Q. Were you acting on what you had been told in regard to that? A. I may have."

He afterwards said he was told by the chief engineer not to swing the bridge in a gale; that is to say, "a strong wind when you can't regulate it, when you can't hold the bridge." He made up his mind perhaps earlier than 4 or half-past 4 o'clock, on his own responsibility, that it was too high a wind for him to open the draw. He says: "I had decided in case I was signaled that I would not open it because the draw could not be opened safely in the wind. At that time when that signal was given, the fire boat was in a position so that if she had turned with the American side end of the draw downstream, that I think it would have hit the fire boat. The fire boat had hit the end of the cradle already. The fire boat was on the American side of the crib. The Maria Martin was on the south of the crib and the fire boat was on the north. The fire boat was a little bit farther north up the stream than the Maria Martin. The fire boat was under steam and I knew she could back up so that was not any reason why I did not open the draw. * * * I do not think I have refused to open the draw for a boat on a signal at any time late in the season. To my knowledge, the engineer in charge never refused to open the draw for any boat on signal, so that from the time of my employment up to the year after, that was the only time I know of the opening of the draw being refused. That is the only time I know of that boat ever coming up there in a storm to get through. I make it a practice to use my own discretion in opening that draw for boats that come up there in storms. I always open it at other times. I remember that same season of swinging the draw and sinking another boat in October or November. I don't remember the name of the boat. * * * It wasn't

caused by my refusing to open the draw originally. We have a counter signal; we are provided with a whistle. There are recognized counter signals on the part of the bridge when they do not intend to open. The bridge blows four whistles to show she will not open. Four whistles were not blown by the bridge at this time. I don't know just why they were not. I was in charge. When the fire boat wanted to get through she did not have hold of the other boat. The fire tug did not want to go through. Q. How do you know the fire tug did not want to go through? A. She could not do anything up there. Q. What? A. I didn't surmise she wanted to go through anyhow. Q. What did she give you the signal for opening the draw for? A. I could not say what she gave the signal for. Q. You surmised she didn't want to go through, is that right? A. Yes, sir. Q. And yet she had given you the signal to open the draw? A. Yes, sir. Q. Why did you surmise such a thing? A. Well I could not say. Q. Now you volunteered this statement and cannot tell why you surmised that? A. Oh, I don't know why. Q. Is it customary for the fire boat to give signals to open the draw when she does not want to go through? A. No, I don't think so. Q. Then when she gave the signal to you to open the draw did it not mean that she wanted to go through? A. Well I didn't think she did. Likely it meant she wanted to go through, and I didn't think she did want to go through because of the circumstances that she was in, in trying to pull that other boat. I judge she blew to let the other boat go through and I saw the other boat could not go through and that was the reason I think why I did not try to open the draw."

The chief engineer, in answer to the question, "In your experience at the bridge would you think it was a safe operation to swing the draw for a boat to pass through in a 60-mile gale?" said, "If I was there and they insisted on coming through I would undertake to swing it, but I would give them warning there was danger coming through if there was any way of warning them. They would go through at their own risk, because I would not say that engine would hold the bridge in a gale of 60 miles an hour. Where the wind works both ways—it don't always work both ways, sometimes it catches the corner and you might lose control of it. The only way to keep control of her is not to let her go fast."

The pilot of the Elliott said: "I backed her around and she was coming along all right until we got almost over to the draw, and when we got almost over to the draw she let go, this stern post let go, and she hit the bridge, and we went down and over on the north side of the pier."

There he tried to pick up the captain of the Elliott and his assistant, who had jumped off the ship onto the crib. But they could not get aboard in the heavy sea and went up the iron ladder from the crib to the bridge and the fire tug went home. Having related this, the pilot went on: "It was impossible to get aboard, so I swung her around and backed, and there is a kind of pocket in there between that cradle and the dock, just like a pocket. Then with that wind I swung around the best I could, and backed, and I was afraid she would not make it in that corner, so I blowed three whistles to the bridge and the bridge didn't open, so I managed to get around and get home all right. * * * That pocket lay between the American bank and the cradle, and that is on the north side of the draw. The reason we blew the three whistles was because we were afraid we could not get out of that pocket, and we wanted the bridge swung so that we could get through. After the second line had taken hold of the Martin, we did succeed in pulling the Martin a little distance. We were coming down the river, and when we backed down far enough we could have turned around and went head first down the river, and then suddenly the timber post or the tow post let go, and by that time the Martin had been pulled over to a position near the draw. We were probably at that time 100 feet south of the draw, and the Martin was probably about 50 feet away from us. Then after the line parted or the tow post parted, the wind blew the Martin against the bridge. From where I was I could not tell whether the cradle or the bridge was hit first. In fact I was busy watching ourselves, that we would not hit something else. As soon as we let go we shot away from her. I could not tell you which end hit first. * * * After this breaking the second time the line gave way,

and the fire tug went to the north side of the draw or this cradle. We were considerably below, you know, and I tried to but could not get alongside because the waves were slashing the deck. * * * We were 50 to 75 feet towards the span of the draw then. The pier below the bridge is the length of the draw itself, half the distance of the bridge. It sticks out down below. It is more than 100 feet, I guess. We were in that pocket. That is when I signaled. My intention was to get out of that pocket and to go through the draw. The only way I understand the bridge could have swung was to eastern because they were fastened with the cables and things that went over on the bridge. If we had swung then the smokestacks and everything would have been knocked off. We were broadsides to the wind at that time. Our own power was able to get us out of that hole, because it did. We were afraid it would not. I didn't blow those whistles to open the draw of the bridge for the purpose of attempting to get through and hauling the Maria Martin through."

The captain of the Elliott, who was then standing on the crib, said: "When our boat blew three whistles, they [meaning the ship] were about halfway alongside the cradle of the bridge; and this boat was fast here and fast here."

He probably meant by that that its stern was against the pier and its rigging against the unopened draw. "That was when we blew our three whistles and our tug was further *east*."

The man with the captain of the Elliott said: "We took hold as you say and it gave way, and we also took another hold and that gave way. The Martin was about in a position to go through the south side of the draw, that is when our lines parted, backing up, left the Martin on the south side and us on the north side, and in fact we were a little ahead of the Martin in going through the bridge. The Martin was farthest from the bridge, and the pilot gave him two or three blasts to open the bridge. Then the Martin passed into the bridge. She went in broadsides. * * * The stern of the Maria Martin struck the cradle. Whether the bow of the Maria Martin went against the bridge I could not say. I was not on the Martin at that time. * * * When it went against the cradle I jumped off, then the wind continued to blow the Martin against the bridge."

Dorrington said that the pilot of the fire boat told him afterwards his intention was, after the line gave way and they blew the whistle for the bridge to open, to go up through on the north side of the crib and come down to the Martin and pull her through the south side. Dorrington boarded his vessel after she got into the bridge, stayed aboard all night, and tried to protect the vessel by fending her off as much as possible where she was chewing against the crib. He says that the stern of his ship was swinging underneath the draw, and if the draw had been opened the vessel could not have jammed because her stern was free.

In answer to the question, "As a matter of fact it is all guesswork whether or not she would go through?" he said, "Not with that wind because the stern swung up under the bridge that night, and so it is possible she would have gone through. Q. You mean that boat would have gone through the draw if she struck the bridge, if the bridge had been open? A. Yes, sir."

The libelant claims the city of Detroit is liable to him for the loss of his ship growing out of: First, the negligence of the fire boat in the way she handled herself and his ship, in failing to ask assistance, and in the abandonment of his ship; second, negligence in failing to provide proper equipment for the fire boat; third, negligence of the bridge tenders in that the bridge was not open when, as claimed by libelant, his ship was in the control of the fire boat, and that upon proper signal the draw was not opened.

The appellee in its answer below admitted, among other things alleged in the libel: "That said city of Detroit had placed said bridge and the operation of its said draw in charge of one or more bridge-tenders, whose duty it became and was to maintain a watch for all vessels of sufficient size which might wish, or be obliged, to pass through said draw, and that it was the duty of said city and its officials and employés to open said draw upon [being informed and notified of] the approach of vessels desiring to pass through said bridge, whether ascending or descending the American Channel of said

Detroit river, said river being a navigable water of the United States, upon which the vessels of the United States have a right to navigate freely and without hindrance."

The answer denied the allegation that the fire boat had control of the ship; denied signaling the engineer on duty at the bridge to open it; avers that it would have been unsafe to have drawn the bridge in a gale of wind blowing at the rate of 60 miles per hour, as it was at the time the ship collided with the bridge; charges the ship with being old, dismantled, and abandoned, and as of no value for the purpose of engaging in navigating the waters of the Great Lakes; charges the libelant with contributory negligence in failing to properly anchor his ship and man her sufficiently; denies negligence, and charges that after the accident the ship was taken to a point near Belle Isle; that she remained there unattended and neglected, and a menace to navigation, and was finally removed by the government of the United States.

The District Court, holding against the libelant on all questions, dismissed the libel. On appeal here all of the assignments of error which require consideration have to do with the several claims of negligence referred to. The parties have agreed that in the event the judgment of the court below is reversed, the question of damages may be inquired into de novo.

M. H. O'Brien, of Detroit, Mich., for appellant.
Walter Barlow, of Detroit, Mich., for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). That the ship had some value cannot be doubted. It is also true, since the decision of the Supreme Court in Workman v. New York City, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314, that in whatsoever capacity a municipality owns, controls, or uses a fire boat, the expense of which the city defrays, an action in admiralty will lie against the city for negligence in the operation of its fire boat.

The respondent's claim of contributory negligence may be disposed of by the statement that the testimony shows activity on the part of the libelant to save his ship. When danger to her seemed probable, he obtained the services of the only tug in the harbor available for use. Indeed, if the fire boat had not undertaken the rescue, it seems quite clear that the Lorimer would have succeeded in saving the drifting ship, and we agree with the court below that contributory negligence is not to be ascribed to the libelant.

[1] We come, then, to the charges of negligence. Whether or not it was the duty of the fire boat to have volunteered to save the ship is not now decided. She was instructed to do so, and it is probable her primary purpose was to save the bridge rather than the ship. Be that as it may, she attempted to save the ship and thereby established a relation between herself and the ship calling for the exercise of care commensurate with the extent of the duty such relationship imposed. It will be observed that the fire boat was not a salvor, for the reason that success did not attend her efforts. It is said in The Sabine, 101 U. S. 384, 25 L. Ed. 982, that:

"Three elements are necessary to a valid salvage claim: 1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success."

The city of Detroit is not making a claim for salvage, and clearly could not do so. The fire boat failed to save the ship. She was at no time in control of her, for the reason that her hawser would not hold. If it had held the ship would not have struck. The rule applicable to a salvor is that she shall—

"use reasonable care for the protection of rescued property, and may lose all right to salvage award, or even render herself affirmatively liable for an independent injury sustained after a successful salvage service."

It is so stated by Judge Lurton, speaking for this court in The S. C. Schenk, 158 Fed. 54, 59, 85 C. C. A. 384, citing The Mulhouse, 17 Fed. Cas. 962, No. 9,910; Serviss v. Ferguson, 84 Fed. 202, 28 C. C. A. 327; The Henry Steers, Jr. (D. C.) 110 Fed. 578, 582; The Bremen (D. C.) 111 Fed. 228; The Duke of Manchester, 2 Wm. Rob. 471; The Neptune, 1 Wm. Rob. 297. The same rule is applicable to cases in which an unsuccessful attempt is made to save a ship in distress. It will be found in The Henry Steers, Jr. (D. C.) 110 Fed. 578, 581, et seq., and in The S. C. Schenk, 158 Fed. 54, 60, 85 C. C. A. 384, 390. In the latter Judge Lurton says:

"When a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salving vessel. This is as far as the reported cases seem to go."

Speaking of those who claim salvage, Dr. Lushington said, in The Cape Packet, 3 Wm. Rob. 122, 125:

"I do not mean to say that they must be finished navigators; but they must possess and exercise such a degree of prudence and skill as persons in their condition ordinarily do possess, and may fairly be expected to display."

In the case of The Dygden, 1 Eccl. and Mar. Cases, 115, that learned admiralty judge denied salvage to fishermen who, without competent knowledge of seamanship and when competent assistance was at hand, undertook to save a ship in distress and failed. He said (pages 116, 117):

"When persons offer their services to vessels in distress, and there are no other individuals on the spot capable of rendering more efficient assistance, this court must look with considerable indulgence at their efforts; because, being the only aid that can be procured, and offered in a state of great exigency, every allowance must be made if they are not possessed of adequate knowledge to perform the duty they had undertaken. But different considerations will apply to the conduct of individuals who assume the character of salvors, when there are persons competent to discharge those duties."

[2] The test to be applied is good faith and reasonable judgment and skill. The Laura, 14 Wall. 336, 344, 20 L. Ed. 813.

Whether on the first trial the line slipped, or that to which it was attached broke, cannot, from the testimony with any reasonable certainty, be said. All of the posts were 40 years old. We have only the owner's word for it that they were sound. The captain of the fire boat and his assistant had had little experience in towing, and attached the hawser to, what seemed to them, posts provided for the purpose. The time after they boarded the ship was sufficient to have made a secure fastening to a tow post proper, assuming that

would have stood the strain. But quick action was required. That is certain from the facts and from the opinions of those qualified to judge. The sea was heavy, the wind was high, and it was getting dark. When the second attempt was made the ship was within 10 feet of the crib, and a secure fastening must be found within about one-half minute. The captain of the fire boat believed, and had reason to believe, he could pull the ship around, and while he probably ought not to have fastened to the quarter post, yet he did not know that, and it presented the appearance of being there for the purpose of use in towing. He did not know the Lorimer was coming to assist until she was near by and about the time he was making the second attempt to fasten his hawser. There was at that time no reason to suppose he could not pull the ship away. One may imagine it was a time of much excitement. We are not able to say that the District Judge was wrong in exonerating the fire boat from the charge of negligence in tying to the quarter post, and should not, in any event, disturb his finding unless it were against the decided preponderance of the evidence. City of Cleveland v. Chisholm, 90 Fed. 431, 33 C. C. A. 157 (C. C. A. 6); The Edward Smith, 135 Fed. 32, 67 C. C. A. 506 (C. C. A. 6). We do not find such preponderance here. In some respects the case is like that of The S. C. Schenk referred to. So far as the captain of the fire boat knew, the ship was lost unless he went to her rescue. What he did in attempting to fasten the hawser was probably what any one would have done except one of great experience in towing vessels. To hold him negligent in not seeking some post which would certainly hold, if any of them would have held, would be to discourage laudable attempts to save vessels in distress by the deterrent fear of a claim for damages if the attempt failed.

There certainly is no clear evidence of culpable negligence or willful misconduct. What Judge Lurton says in the Schenk Case is particularly applicable (158 Fed. 60, 85 C. C. A. 390):

"But when, as here, liability is sought to be fastened upon a salving vessel solely because the attempted service was ineffectual, no independent injury having been caused by the salvor, there is no responsibility if the service was rendered in good faith, without clear evidence of culpable negligence or willful misconduct."

We reach a similar conclusion with respect to the claim of having negligently abandoned the ship after she struck. Well might the captain of the fire boat have thought the ship would sink, 40 years old as she was, though stauncher than he knew, with waves four feet high dashing on her and the crib, all in the darkness of night, with the broken spars, masts, and yards falling on deck, and with, apparently, to him, no place on the ship to which to tie sufficiently strong to stand the strain of towing.

[3, 4] The claim of negligence for the failure of the assistant engineer to open the bridge gives us more concern. It requires a consideration of the duties and responsibilities of a municipal corporation operating a drawbridge over navigable waters, and calls for the consideration of rules not involved in cases of salvage, or in unsuccessful attempts to rescue ships in distress. Whatever the law

may be in some of the states exonerating municipalities from liability for negligence in the maintenance and management of drawbridges operated, not for the pecuniary benefit of the municipality, but in behalf of the public and in governmental capacity, or in cases in which it is declared there is no liability for the manner of construction or carelessness in the operation of a drawbridge unless the liability is expressly imposed by statute, it may be regarded as settled that liability in the management of this drawbridge may be fixed upon the municipality if the facts show negligence in the discharge of their duties by those to whom the municipality had intrusted its management. This is so because the locality of the injury to the vessel was in navigable waters, which brings the case within the admiralty jurisdiction of the courts of the United States. In The Plymouth, 3 Wall. 20, 33 (18 L. Ed. 125) it is said by Mr. Justice Nelson:

"It is admitted by all the authorities that the jurisdiction of the admiralty over marine torts depends upon locality—the high seas, or other navigable waters within admiralty cognizance; and, being so dependent upon locality, the jurisdiction is limited to the sea or navigable waters not extending beyond high-water mark."

And it is said by Mr. Justice Field in The Rock Island Bridge, 6 Wall. 213, 215 (18 L. Ed. 753):

" * * * The jurisdiction of the admiralty extends to all cases of tort committed on the high seas, and in this country on navigable waters."

And then he goes on to say that redress for such torts may be had in courts of admiralty in personam in other cases than those in which proceedings may be had in rem for the enforcement of a maritime lien.

And while it is shown by Judge Jenkins in Milwaukee v. The Curtis (D. C.) 37 Fed. 705, that no action would lie in admiralty against the owner of a vessel for damage done by it through its negligence to a bridge for the reason that the locality of the injury was on the land, the bridge being on land; yet he makes it very clear that the locality of the thing to be considered is of the thing injured, and not of the agent causing the injury, and that when the injury is to a vessel afloat, even though the negligence originated on land, the tort is maritime and is within the jurisdiction of the admiralty. See cases cited by him, and by Judge Addison Brown in Leonard v. Decker (D. C.) 22 Fed. 741.

In Daly v. New Haven, 69 Conn. 644, 38 Atl. 397, the Supreme Court of Connecticut, in holding that the duty of operating a drawbridge which was a part of a public highway over a navigable river is a public governmental duty and no liability attached to a municipal corporation charged with that duty for negligence in the operation of the draw, unless the liability was imposed by statute, referred to the case of Greenwood v. West Port, decided in the United States District Court for the District of Connecticut, and reported in 62 Conn. 575, 53 Fed. 824, and 63 Conn. 587, 60 Fed. 560, as not in conflict with the court's view of the public governmental character of the municipality's duty in the management of the drawbridge, and said (69 Conn. 649, 38 Atl. 398):

"*   *   * That decision rests upon the somewhat peculiar and exceptional state of facts in that case, and upon principles of maritime law that have no application here."

In that case, which was a libel in personam, a steam barge signaled her approach and desired to pass through a drawbridge. Her signals being unheeded, she was compelled to wait, was caught by the ebb tide, struck the bottom, and sank. This was held to be a maritime tort, and that the court had jurisdiction for an injury done to a vessel on navigable water by a bridge or permanent structure, citing Boston v. Crowley (C. C.) 38 Fed. 202, 204, and Assante v. Charleston Bridge Co. (D. C.) 40 Fed. 765, 767.

Judge Townsend was of opinion that after the municipality had undertaken to manage and control the drawbridge, it was liable for misfeasance, although it might not have been originally charged with the duty of opening the draw, and he cites Judge Addison Brown in Edgerton v. The Mayor, etc., of New York (D. C.) 27 Fed. 233, and other cases, in support of the statement that—

"in constructing the bridge with a draw, and in undertaking to open and manage the draw, so as to allow vessels to pass, the state and the city have recognized the right of vessels to pass through without any appeal to the national authority to protect that right." People v. Saratoga, etc., R. R. Co., 15 Wend. 113, 134, 136, 30 Am. Dec. 33; Escanaba Co. v. Chicago, 107 U. S. 678, 683, 2 Sup. Ct. 185, 27 L. Ed. 442; Miller v. Mayor, etc., of New York, 109 U. S. 385, 393, 3 Sup. Ct. 228, 27 L. Ed. 971.

Judge Brown states the rule (quoted by Judge Townsend with approval):

"Having thus recognized the rights of commerce and undertaken to provide accommodations for the passage of vessels, the corporation is bound that the custodians of the bridge shall use ordinary diligence to avoid accidents to vessels going through the draw at customary hours and in the customary manner, as one of the incidents of the care, management and control of the bridge itself. It is responsible, therefore, for the want of ordinary care and diligence in its servants, and for the consequent damage."

The bridge was an obstruction to navigation. It was so held by the Circuit Court of Appeals in the Seventh Circuit in Clement v. Metropolitan, etc., Ry. Co., 123 Fed. 271, 59 C. C. A. 289, and that the right of navigation was paramount; that the bridge must be so constructed that it might be readily opened to permit the passage of vessels, and must be placed in charge of competent persons and be equipped with lights and signals, and give timely warning to approaching vessels, if for any reason it could not be opened.

[5] It would seem that, without any statutory requirement of the United States relative to the operation of drawbridges over navigable waters, the city, in the management of the draw of the bridge, must be held to ordinary care, having in mind the purposes for which the draw was made and the circumstances of the case.

But Congress have expressly imposed positive duties in the management of such drawbridges. Section 5, Act Aug. 18, 1894, c. 299, 28 Stat. 362, Comp. St. 1913, § 9973, provides:

"That it shall be the duty of all persons owning, operating and tending the drawbridges now built, or which may hereafter be built across the navi-

gable rivers and other waters of the United States, to open, or cause to be opened, the draws of such bridges under such rules and regulations as in the opinion of the Secretary of War the public interests require to govern the opening of drawbridges for the passage of vessels and other watercrafts, and such rules and regulations, when so made and published, shall have the force of law. * * * "

We have not been favored with those rules and regulations, but Congress have provided, also, that:

"If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft. * * * " Act March 23, 1906, c. 1130, § 4, 34 Stat. at L. p. 85 (Comp. St. 1913, § 9964).

While we have found no cases dealing with these requirements relating to a drawbridge, yet the measure and extent of the duty imposed by these statutes may, by analogy, be drawn from other statutory regulations applicable to cases of negligence within the jurisdiction of the courts of admiralty.

It is required by article 16, Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 326, Comp. St. 1913, § 7854, that—

"a steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

In the case of Clyde S. S. Co. (D. C.) 134 Fed. 95, 97, it was held that failure to observe this requirement created a presumption of fault. See, also, The Georgic (D. C.) 180 Fed. 863.

The mates of vessels are required to be licensed. U. S. Comp. St. 1913, § 8200. It was held in The Eagle (D. C.) 135 Fed. 826, that when one of two vessels in collision was in charge of an unlicensed mate there is a presumption that that fact caused or contributed to the collision, and the burden is upon the vessel to show that the collision was not attributable to that fact.

Again, under the act of April 29, 1864 (Comp. St. 1913, § 7963):

"Every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse. * * * "

It was held in the case of Fred W. Chase (D. C.) 31 Fed. 91, 94, that this rule applied notwithstanding the existence of a gale.

Judge Swan held in The Lansdowne (D. C.) 105 Fed. 436, 443, that under the decisions of the English and American courts in case of collision, it is incumbent upon a vessel which has disregarded a rule of navigation to show that its violation not only did not contribute to the collision, but could not have done so.

The whole subject is comprehended in what Mr. Justice Strong says in The Pennsylvania, 19 Wall. 125, 136 (22 L. Ed. 148):

"The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests

upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

While it might probably be going too far to say that the failure to open the bridge caused the injury to the vessel, yet the city, having disobeyed the positive statutory mandate, as well as a duty imposed upon the municipality by reason of undertaking to manage the drawbridge, should show that its failure could not have contributed to the injury.

It is not necessary to decide that negligence is to be ascribed to the owner of a drawbridge, competently built and manned, because of his failure to turn the draw even upon signal, when a competent engineer would, to preserve the bridge, decline to turn the draw in an unusual gale of such force as to cause him to believe that to turn the draw would result in destruction to the bridge or destruction to a boat which had signaled for the opening of the draw. That is not this case. It is here shown that the chief engineer, had he been on duty, would have turned the draw. While it appears that an unusual gale was raging, there is no evidence at all that its character would entitle it to be defined as "vis major" or "act of God." And there is no satisfactory evidence in the case from which an inference may be drawn that the turning of the bridge would probably have resulted in its destruction, or destruction of the smokestacks of the fire boat. We say this notwithstanding the testimony of the assistant engineer who gave at least two reasons why he did not turn the draw, reasons not at all dependent upon or related to each other. The evidence tends to establish the fact that the bridge could have been handled in safety if care were taken that it go not too fast. Anxiety of the assistant engineer for the smokestacks of the fire boat was not justified. His view is shared by the captain and pilot of the fire boat, all testifying for the municipality, their employer. They are, however, expressing mere opinions which do not agree with the opinions of the owner of the ship and the captain of the Lorimer, both apparently competent navigators. The facts must tell the story.

If the fire boat was in the pocket described, what shall be said of the reason her pilot gives for blowing the three whistles? It was—

"because we were afraid we could not get out of that pocket, and we wanted the bridge swung so that we could get through."

In another part of his testimony he says his smokestack would have been knocked off if the bridge had swung. He said the only way the bridge could have been swung "was to eastern because they were fastened with the cables and things that went over on the bridge." If, when he whistled, the spars of the ship were in contact with the bridge, the draw could not have been swung to eastern; certainly not without destroying all masts of the ship and probably the ship itself. The captain of the Elliott, standing on the bridge, described his boat as "about halfway alongside the cradle of the bridge," and that the ship was then fast in the bridge. The man with the captain testified that the Martin passed into the bridge broadside *after* the whistles were blown.

The assistant engineer in charge, although he says he thought the draw might hit the smokestacks of the fire boat, says:

"The fire boat was under steam, and I knew she could back up, so that was not any reason why I didn't open the draw."

The fact probably is that the fire boat, when the second attempt failed, shot off on the north side of the crib not far from its end. It was completely in control; was a powerful boat and was not in any danger of having her smokestacks struck by the turning of the draw, unless she voluntarily had stayed in a place of danger, if, indeed, she was in such a place; certainly not, if a competent person, careful not to let the draw go too fast in a heavy wind, had been in charge.

Why did the fire boat whistle at all if she did not intend that she, or the ship, or both, should be given the opportunity of going through the draw, and if the fire boat was in the pocket and in danger of her smokestack being knocked off by the turning of the draw, why, in such a situation, did she invite certain disaster to herself if her pilot knew, as he must have known, if it were true, that the draw could not turn eastwardly because the masts and spars of the ship were already in the bridge and falling by reason of contact with the draw itself. The inference is quite clear that when the signal was given the draw could have been turned eastwardly, if not both ways, and that if it could have been turned only westwardly that the fire boat could easily have gotten out of the way. In this state of the facts, it must be held that this reason for not turning the bridge is not a good reason, and not one which would have governed the conduct of a reasonably prudent and reasonably competent engineer. The fact is that the testimony of the assistant engineer in charge is so uncertain and unsatisfactory and contradictory that it is entitled to little, if any, weight. The opening of the draw was the only chance the ship had. She might not have gone through, but, on the other hand, it is highly probable that she would have done so. It does not appear that she had actually jammed between the crib and the pier at any time. During the night her stern had swung around under the draw, and the ship was only prevented from going through by such rigging as was not broken catching on it. So says her owner; and it is not without significance that the man with the captain of the Elliott said that after the second hold gave way "the Martin was about in a position to go through the south side of the draw; that is when our lines parted." It is true her anchors might have fouled the water pipe and held there, but her cables were 360 feet long, and she would have ridden at anchor that distance away from the bridge. The pipe might have broken, and the wind, continuing as it did until the next early morning and growing gradually less in force, might have carried her upstream some distance further, and she might have eventually come to grief.

In view of the broad admission by the city, in its answer, of its duty, and of the failure of the assistant engineer to open the draw when reasonable regard for the safety of the ship, and more especially when the statute expressly required him to open it, we are of opinion that it was incumbent upon the city to show that the injury to the ship could not have resulted from the failure to open the draw. In the ab-

sence of such showing we must and do find the city liable for negligence.

It follows that the judgment below must be reversed and the cause remanded, with instructions to enter a decree in accordance with this opinion, and to determine, by reference to a master, or otherwise, the loss to which the libelant is entitled.