**NASSAU COUNTY BRIDGE AUTHORITY, as custodian and user of Atlantic Beach Bridge, Libellant,**

v.

**TUG DOROTHY McALLISTER, her engines, boilers, etc., and her owner, McAllister Brothers, Inc., Claimant-Respondent.**

No. 61 A 359.

United States District Court
E. D. New York.
June 25, 1962.

Burlingham, Underwood, Barron, Wright & White, New York City, Proctors for libellant (Stanley R. Wright and Edward L. Wyckoff, Jr., New York City, of counsel).

Purdy, Lamb & Catoggio, New York City, Proctors for claimant-respondent (Vincent A. Catoggio, New York City, Advocate).

ABRUZZO, District Judge.

This action was instituted by the libellant to recover damages sustained when the claimant-respondent's tug DOROTHY McALLISTER collided with the westerly fenders of the Atlantic Beach Bridge over Far Rockaway Bay or Inlet on the northerly side of the island of Long Beach, New York.

On March 22, 1960, the tug DOROTHY McALLISTER was towing the barge MONTAUK which was loaded with high octane gasoline, on a hawser, proceed-

ing eastward in Reynolds Channel of the Far Rockaway Bay or Inlet and was approaching the Atlantic Beach Bridge. The tide was flooding, running eastward. It was snowing or had snowed, and a blustery wind was blowing from the west and northwest. On approaching East Rockaway Inlet the hawser was shortened so that there was only 15 or 20 feet between the stern of the tug and the bow of the barge.

Jackson, the bridge operator, testified that he saw the tug and barge about an hour before they got to the bridge. When they were a distance west of the Coast Guard Station, which is about 900 feet from the bridge on the south side of the channel (Geodetic Chart, Exhibit 1), the tug blew a three-whistle signal. Jackson did not know the distance of the station from the bridge. Upon hearing the signal, Jackson went through his usual procedure of putting on the red lights for the bridge, sounding of a gong to stop vehicular traffic on the bridge, and lowering of four gates which barred this traffic from moving. He then pressed the bridge release lock button but did not get his release lights because the locks did not release. The lights were the only indication as to whether the locks had released. He again pressed the button and the locks released half way but he still did not get his lights for the lock release. He testified that he pushed the lock button four times (Tr. 22–23).

Jackson testified that it takes about four seconds for the locks to release so that he waited that period each time he pushed the lock button (Tr. 32). It takes about 25 to 30 seconds for the gates to come down·(Tr. 32). He blew a danger signal when he saw the bridge would not open—two short blasts and two short blasts again, and then waved a red flag. His signal was answered by a two-blast signal from the tug. He called down to the assistant manager on duty at that time and asked him what he should do— he had a few cars waiting to go across and he thought, "Well, maybe it would be quite awhile before they would get near the bridge." (Tr. 24). He then raised the gates to permit vehicular traffic to go through. He later went through the same procedure of pushing the lock button and the mechanism functioned properly—the lights came on informing him that the locks were releasing and that the bridge would open. During this time he observed the tug pull to the left and try to turn around but she kept drifting towards the bridge, striking two of the fenders, the northwest fender and then the southwest one, damaging them.

Neither Jackson nor Morse, libellant's Supervisor of Bridge Maintenance, could account for the failure of the bridge's release lock button to operate. Inspection of the bridge revealed no defects and Morse attributed the failure to the possibility that a piece of ice or slush might have gotten on one of the levers of the lock limit switches located under the open decking on the bridge. Morse testified that the last previous time that the mechanism had failed to function properly was two or three years prior to the DOROTHY McALLISTER occurrence and that thereafter the lock system had been completely re-designed.

Captain Holmes testified that he was at the wheel of the tug and Captain Purdy, since retired, was also in the pilot house. Captain Purdy did not testify. When the tug and its tow were at least 1000 yards from the bridge Holmes blew · his first signal, a three-whistle signal, but received no signal from the bridge and did not see its gates go down. When he was about 600 yards from the bridge he blew a second three-whistle signal and right after that he saw the gates go down. At that time he was going at dead slow—as slow as possible—but the tide was flood underfoot at a rate of at least 3 knots an hour. When he was about 500 feet from the bridge he heard four weak signals from the bridge and then saw someone on the bridge waving a red flag. At 3 knots an hour and 500 feet from the bridge he would reach it in less than 2 minutes. The bridge could be raised with the vehicular traffic gates down in much less than a minute's time.

He tried to "round up" the hawser and turned the tug hard left to come into the tide to try to clear the southwest corner of the abutment, but he did not have enough time and the bow end of the barge hit the northwest corner of the abutment and her stern the southwest fender. He testified that he tried to round up on the hawser because "we were very close to the bridge and the barge was loaded with a high octane fuel." He was afraid of a collision—hitting concrete on steel where a spark would set it all off. He could see that she was going to hit and he maneuvered the tug and barge in order "not to hit harder than she did." Holmes testified that the channel was 800 or 900 feet wide and he was about 50 or 75 feet from the Atlantic Beach side of the channel.

Libellant cites 33 CFR 203.180 which applies only to "Nassau County highway bridges across Reynolds Channel at Long Beach and Atlantic Beach, N. Y." as prescribed by U. S. Engineers, the pertinent provisions of which are as follows:

"(a) The owner of or agency controlling these bridges shall provide the appliances and the personnel necessary for the safe, prompt, and efficient operation of the draws.

"(b) Except as provided in paragraph (c) of this section, the draws shall be opened promptly when the prescribed signal for the opening of the draw is received from an approaching vessel which cannot pass under the closed draw.

\* \* \* \* \* \*

"(d) *Signals—(1) Call signals for opening of draw—(i) Sound Signals.* By vessels owned, controlled, or employed by the United States, four distinct blasts of a whistle, horn, or megaphone, or four loud and distinct strokes of a bell, and by all other vessels, three distinct blasts of a whistle, horn, or megaphone, or three loud and distinct strokes of a bell, sounded within reasonable hearing distance of the bridge.

\* \* \* \* \* \*

"(2) *Acknowledging signals by the bridge operator—(i) Sound signals.* Draw to be opened immediately: Same as call signal. Draw cannot be opened immediately or, if open, must be closed immediately: Two long distinct blasts of a whistle, horn, or megaphone, or two loud and distinct strokes of a bell, to be repeated at regular intervals until acknowledged by the vessel."

The claimant-respondent relies upon Title 33 U.S.C.A. §§ 494, 499 and 512 which provide:

"§ 494. *Obstruction of navigation; alterations and removals; lights and signals; draws; tolls*
" \* \* \* If the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft. \* \* \*

"§ 499. *Regulations for drawbridges; penalties for violation; enforcement*

"It shall be the duty of all persons owning, operating, and tending the drawbridges built prior to August 18, 1894, or which may thereafter be built across the navigable rivers and other waters of the United States, to open, or cause to be opened, the draws of such bridges under such rules and regulations as in the opinion of the Secretary of the Army the public interests require to govern the opening of drawbridges for the passage of vessels and other water crafts, and such rules and regulations, when so made and published, shall have the force of law. Every such person who shall willfully fail or refuse to open, or cause to be opened, the draw of any such bridge for the passage of a boat or boats, or who shall unreasonably delay the opening of said draw after reasonable signal shall have been given, as provided in such regulations, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be

punished by a fine or not more than $2,000 nor less than $1,000, or by imprisonment (in the case of a natural person) for not exceeding one year, or by both such fine and imprisonment, in the discretion of the court; * * *.

"§ 512. *Obstruction of navigation*

"No bridge shall at any time unreasonably obstruct the free navigation of any navigable waters of the United States. June 21, 1940, c. 409, § 2, 54 Stat. 498."

The libellant raises the following points:

I. Entrusted with high octane gasoline, Holmes's attitude was frighteningly irresponsible.

II. The tug clearly was at fault for failing to hold back at a safe distance from the bridge until receiving the all clear signal, which never was given.

III. The temporary malfunctioning of the bridge controls was not due to any negligence on the part of libellant.

The claimant-respondent, on the other hand, contends that:

1. The bridge tender was inefficient and inattentive.

2. The bridge draw was not maintained in proper operable condition.

3. The bridge tender did not operate the bridge opening devices properly.

From his testimony it is evident that Jackson, the bridge operator, had very little knowledge of the tide with the DOROTHY McALLISTER. He testified (Tr. 37):

"Q And that is a pretty fresh tide, isn't it, in there?

"A Well, it runs, yes.

"Q About three, over three miles an hour?

"A. I don't know how fast it runs; I am sorry."

When asked if he had any idea of where the tug was when he waved the red flag, Jackson testified (Tr. 39–40):

"A He was, as I say, a little west of the Coast Guard station, west of the Coast Guard Station.

\* \* \* \* \*

"Q Do you know how far that Coast Guard station is from the bridge?

"A No, I do not.

"Q It is less than one thousand feet, isn't it?

"A I don't know. I have no idea."

He testified that he pressed the lock control button four times before he gave the danger signal by which time Holmes testified he was about 500 feet from the bridge. The fact that he did not give the danger signal sooner and went through the motions of pressing the lock button four times without any response would indicate that he was not mindful of the wind, tide underfoot and closeness of the tug to the bridge. When he "thought, well, maybe it would be quite awhile before they would get near the bridge" (Tr. 24), according to his own testimony, the tug about that time was trying to fight her way to get away from the bridge—the tide kept pulling her right into towards the bridge and towards the fenders (Tr. 25).

Jackson testified that the tug was "quite a way" west of the Coast Guard Station when he heard her three-whistle signal (Tr. 38), and when he waved the red flag the tug was "a little west of the Coast Guard Station" (Tr. 39).

Title 33 U.S.C.A. §§ 494, 499 and 512 are applicable to the instant case. Violation of its statutory duty makes the bridge presumptively negligent and liable under the doctrine of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L. Ed. 148; see Conklin v. City of Norwalk, 270 F. 68, 69 (C.A.2d); The Fort Fetterman v. South Carolina State Hwy. Dept., 261 F.2d 563, 567 (C.A.4th). In Dorrington v. City of Detroit, 223 F. 232 (C.A.6th), the drawbridge operator failed to open the bridge in violation of the statute and the court, in reference to The Pennsylvania rule, said (p. 245):

"While it might probably be going too far to say that the failure to

open the bridge caused the injury to the vessel, yet the city, having disobeyed the positive statutory mandate * * * should show that its failure could not have contributed to the injury."

In City of Cleveland v. McIver, 109 F. 2d 69 (C.A.6th), the freight steamer, attempting to avoid collision with a bridge, when aware that its signal for the opening of the draw was being ignored, reversed its engines. The result was that her stern swung to port, collided with and damaged a tug moored at a city dock. The sole issue was whether the steamer was at fault in failing to reverse her engines in time to avoid contact with the bridge and collision with the tug. When she was about two-thirds of a mile above the bridge the steamer blew one blast of her whistle and, when a thousand feet from the bridge, the proper bridge signal was given. The steamer was then proceeding at about 2 miles an hour with engines at slow speed. When about 800 feet from the bridge the engines were stopped and another bridge signal given, but the draw failed to open. When the steamer had drifted to within 300 feet of the bridge, the bridge captain signalled by waving his hands and calling out that the draw would not open. The steamer's engines were then reversed, but too late to avoid slight contact with the bridge and collision with the tug. The Court said (p. 72):

"A bridge over a navigable stream obstructs navigation, the right to which is paramount. In recognition of this right, Congress has provided (Title 33, § 494, U.S.C.A.) that if a bridge is constructed with a draw, the draw shall be opened promptly upon reasonable signal, and (Title 33, § 499, U.S.C.A.) that the rules and regulations of the Secretary of War requiring the opening of drawbridges shall have the force of law. So it has been held that if, for any reason, a bridge cannot be opened, proper signals to that effect should be given. Clement v. Metropolitan etc. Ry. Co., 7 Cir., 123 F. 271;

Great Lakes Towing Company v. Masaba S. S. Co., 6 Cir., 237 F. 577; Dorrington v. City of Detroit, 6 Cir., 223 F. 232, 243, 245.

"Upon the sounding of the bridge signals by the Fleetwood, its master, proceeding at slow speed, had the right to assume that the law would be obeyed and that the draw would open unless the customary warning signal was given. It is true the red ball was not up, but if it were it would have conveyed no information to the master of the Fleetwood beyond that furnished by the closed draw, Chicago v. [Chicago] Transportation Co., supra [7 Cir., 222 F. 238, L.R.A.1915F, 1062]. On the other hand, the sounding of the traffic bells and the closing of the traffic gates upon the bridge, expressed to his mind the intention of the bridge crew to open the draw. They constituted an invitation to proceed. In relying upon them he was guilty of no fault. * * *

"Whether, after being made aware, by the signal of the bridge captain, that the draw would not open, the efforts of the Fleetwood to avoid collision rose to skillful navigation, is of little significance, since the maneuver was in the face of an emergency and must be so tested. The Eureka, 9 Cir., 80 F.2d 303. * * *"

In Conklin v. City of Norwalk, supra, a question presented by the appeal was whether the operator of the bridge complied with the rule prescribed for the operation of the bridge. That rule pertains to call signals for opening of the draw and acknowledging signals by the bridge operator. There the bridge tender testified that he did not hear the horn signals given by the schooner until the schooner was approximately 500 feet away, at which time he began preparation for opening the draw. The gates intended to keep traffic off the bridge when the draw was open were out of order, and this caused delay; but no signal to the effect that the bridge would

not or could not open in time was given the schooner. The Court held (270 F. p. 69):

"On the whole, we conclude that due warning was given the bridge tender, that he failed to hear until the schooner was between 500 and 600 feet distant, and that if the bridge had been fully in order it could have been opened before the schooner arrived. Whether the temporary displacement of the passenger gates caused much delay is not very clearly shown, but it is plain that it was the duty of the bridge tender to know whether he could or could not open the draw within the time that would elapse between his seeing the schooner and her probable arrival at the draw. If he did not think he could open the draw within that time, he should have hung out a warning signal."

In Clement v. Metropolitan West Side El. Ry. Co., 123 F. 271 (C.A.7th), the west towerman testified that he undertook to open the bridge, but was unable to do so, as the "locks would not work." The Court held (p. 273):

"A bridge spanning a navigable river is an obstruction to navigation tolerated because of necessity and convenience to commerce upon land. Such a structure must be so maintained and operated that navigation may not be impeded more than is absolutely necessary, the right of navigation being paramount. * * *If for any reason the bridge cannot be opened, proper signals should be given to that effect, such as will warn the approaching vessel in time to heave to." (Italics added)

In Southern Transp. Co. v. City of New York, 98 F.Supp. 967 (E.D.N.Y.), affirmed, 190 F.2d 1023 (C.A.2d), libellant and respondent were held jointly liable for damages sustained by the libellant's barge by reason of colliding with the abutment of the Greenpoint Avenue Bridge. The Court held that the failure to open the bridge timely was sufficient reason for holding the bridge responsible. The record was bare of any satisfactory explanation of the delay. The tug had a right to assume that the bridge would be timely opened for passage in response to a signal. It held the tug also responsible in negligently maneuvering the flotilla forward, towards the bridge, without reversing or slowing its speed or headway when, "in a reasonable view of the situation" it was apparent that the bridge was not opening and a dangerous situation was being created. That case is distinguished from the case at bar in that the Master of the tug in charge of the flotilla saw that the bridge was still closed and that traffic was still moving across the bridge and did not make any effort to control his tow until he got very close to the bridge.

Newtown Creek Towing Co. v. City of New York, 49 F.2d 475 (E.D.N.Y.), cited by the libellant in support of its contention that the bridge was not at fault for the temporary malfunctioning, is not in point, for there damages were sought for the delay suffered by the libellant's tug because the bridge could not be opened, due to the breaking of a concealed element in the hoisting gear.

Nor is Chester A. Poling, Inc. v. City of New York, 29 F.Supp. 774 (E.D.N.Y.), cited by the libellant, in point. The Court decided that where a drawbridge maintained by the city was well constructed, was successfully operated for 30 years, and was periodically inspected, the city was not negligent by reason of breaking of bearing bolts and the trunnion shaft, and the city which made repairs promptly was not liable to a user of the bridge for ensuing delay in opening the bridge.

Holmes testified that he blew a three-whistle signal when he was 1000 yards from the bridge. When he was 600 yards from the bridge he blew a second three-whistle signal and right after that he saw the gates go down. When he was 500 feet from the bridge he received the danger signal indicative that the bridge could not open. He was approaching as slow as possible with a 3-knot current on

**174**

a flood tide. The Court believes the testimony given by Holmes.

■■ This Court finds, in the light of the decisions reviewed in this opinion, that Holmes, until he received the danger signal, had a right to assume that the bridge would be timely opened. The closing of the traffic gates upon the bridge expressed to his mind the intention of the bridge tender to open the draw. That constituted an invitation to proceed.

■ Whether, after being made aware, by the signal of the bridge tender, that the draw would not open, the efforts of Holmes to avoid collision rose to skillful navigation, is of little significance, since the maneuver was in the face of an emergency and must be so tested. Holmes's testimony stands alone as to whether under the circumstances he skillfully maneuvered his tug and tow. There was no contradiction of his testimony as to that.

The libellant's claim that Holmes's attitude was frighteningly irresponsible is not sustained. Its claim that the tug clearly was at fault for failing to hold back at a safe distance from the bridge until receiving the all-clear signal, which was never given, is not sustained. With respect to the temporary malfunctioning of the bridge controls, negligence on the part of the bridge cannot be predicated on such malfunctioning.

A review of the facts strongly indicates that the crucial and important point in this case is the location of the DOROTHY McALLISTER when Jackson signalled that the bridge would not open. If the tug was at that time "a little west of the Coast Guard Station," as Jackson testified, it would have been approximately 900 feet from the bridge.

The Court finds that, had the danger signal been given when the tug was 900 feet from the bridge, Holmes could have safely maneuvered his tug and tow out of danger.

The Court finds further that Jackson blew the danger signal and waved the red flag when the tug was 500 feet from the bridge.

■■ The Court finds further that the tug was approximately 600 yards, or 1800 feet, from the bridge when the bridge tender received her three-whistle signal. Except for the 25 to 30 seconds it took for the gates to come down and for the four attempts by Jackson to open the draw, each of which required a period of four seconds, no explanation was offered for the remainder of time that would have elapsed while the tug was proceeding from a point 1800 feet from the bridge to 500 feet when the danger signal was given. At 3 knots an hour it would have taken the tug from 3 to 4 minutes to travel that distance. It was the duty of the bridge tender to know whether he could or could not open the draw before the tug reached a point 500 feet from the bridge. His course of action strongly indicates confusion or inattentiveness. The Court finds further that it was the duty of the bridge tender to know that the tide underfoot with the tug was a 3-knot current and he should have taken into consideration the force of the wind.

■ The Court finds further that the damage to the bridge was caused solely by reason of the fact that the bridge tender did not give the danger signal that the bridge would not open in sufficient time for the tug to heave to.

The bridge violated Title 33 U.S.C.A. §§ 494, 499 and 512.

With respect to the claimant-respondent's contention that the bridge tender was inefficient and inattentive, the Court finds that he was more inattentive than inefficient, and it could be added that he lacked good judgment under the circumstances.

There is no evidence on which this Court can predicate negligence on the theory that the bridge was not maintained in proper operable condition, nor can it be said, as claimant-respondent contends, that the bridge tender did not operate the bridge opening devices properly.

The Court concludes, therefore, that the DOROTHY McALLISTER was free from fault or negligence and that the Nassau County Bridge Authority has failed to sustain the burden of proving its claim.

The foregoing seems to state sufficiently the facts found and conclusions thereon. If any further facts are required, they may be submitted by either party to this action.

A decree may be entered in accordance with this decision within 20 days.