## THE S. C. SCHENK.

(Circuit Court of Appeals, Sixth Circuit. December 17, 1907.)

No. 1,681.

1. TOWAGE—LOSS OF DAMAGE TO TOW—LIABILITY OF TUG.

That a tow line properly secured will not slip off of the tow posts of a tug is a reasonable presumption, and evidence of damages resulting to the tow from the slipping of the tow line, unexplained, makes a prima facie case of negligence against the tug.

2. SALVAGE—NATURE OF SERVICE—SALVAGE OR TOWAGE SERVICE.

It is the peril of the vessel saved and the circumstances under which the assistance was rendered which determines whether the service was a salvage service or not.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 1–12.]

3. SAME—NEGLIGENCE OF SALVING VESSEL—LIABILITY.

When a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right to compensation, but an affirmative award of damages against the salving vessel, but there is no liability on the part of such vessel solely because the attempted service was ineffectual, no independent injury having been caused by the salvor, and if the service was rendered in good faith, without clear evidence of culpable negligence or willful misconduct.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 52.]

4. SAME—EVIDENCE CONSIDERED.

A steamer with two barges in tow on Lake Superior was driven to seek refuge from a gale in the harbor of Marquette. It was a dark night, with snow and rain and a wind blowing 75 miles an hour; and, in attempting to enter the harbor, a collision occurred between the two barges, with the result that the rear one was cast adrift, with one anchor disabled, half a mile from a shore on which she was being driven by the wind. The harbor tug Schenk, in response to signals from the steamer, came to her assistance, and at her request went in search of the barge, and, having found her, took a line and started with her for the harbor. After proceeding a short distance, the line slipped from the tow posts, and the barge again went adrift and was driven on shore; the tug being unable to render further assistance, owing to insufficient depth of water. It was shown that the line was fastened by a proper method, but the deck and tow posts were covered with thin ice, and there may have been some want of skill in making the fastening because of the inexperience of one of the line men, who was, however, the best obtainable, owing to a strike. It was conceded that, unless rescued, the barge would in any event have gone ashore, and the Schenk was the only tug available with sufficient power to render the service. *Held*, that the service was one of salvage, and not of towage, and that the negligence of the tug, if any was slight, and not such as to condemn her as the proximate cause of the loss of the barge.

Appeal from the District Court of the United States for the Eastern District of Michigan.

T. E. Tarsney, for appellants.

H. A. Kelley, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge. This is a libel against the tug Schenk by the owners of the barge Mary N. Bourke, which was cast away upon the beach of Lake Superior near Marquette, whereby great damage was sustained by the vessel and her cargo. In substance, the libel charges, that the wreck of the Bourke was due to the negligence of the tug while towing her into the harbor of Marquette. The facts necessary to be stated are these: The steamer Schoolcraft bound down Lake Superior, having in tow the barges Nester and Bourke, in the order named, was driven by stress of weather to seek refuge from a gale in the harbor of Marquette. When about one-half mile northeast of the southerly end of the breakwater, she sounded four blasts for a tug. She also slacked her speed, and undertook to shorten her tow lines to better control her tow in rounding the southerly end of the

breakwater, a measure necessary to get into the harbor. In doing this the Bourke and Nester collided, the Bourke sustaining some damage about her starboard bow, whereby she lost her green light and had her starboard anchor so jammed that it was rendered temporarily useless. To add to her distress, the tow post on the Nester, to which was attached the Bourke's tow line, gave way, and she was cast adrift within a half mile of the shore, with a gale of 75 miles per hour blowing her directly upon the beach and without any power of her own. About the time of this misadventure the steamer again blew for a tug. This was about 1 o'clock a. m. of the morning of April 26, 1902. The tug Schenk was a powerful harbor tug engaged in the business of assisting vessels into and out of Marquette harbor. Upon the night in question she was lying moored to an old ore dock well inside the harbor, with a low head of steam. She was notified by telephone from the life-saving station that there was a steamer with a tow off the harbor, and at once began to get up steam to go out. At or about the entrance to the harbor she passed the Schoolcraft, with the Nester in tow, coming into the harbor. Thinking that her help was needed by the Nester, and not hearing the orders from the deck of the Schoolcraft, she passed clear by the steamer and went to the Nester. Advised that her help was not needed, as the Nester had come around in the wake of her steamer and was entering the harbor, she went back to the Schoolcraft, then well up in the harbor. The master of the tug was then told from the deck of the steamer that her stern barge had broken adrift out in the lake, and requested that the tug go out to her assistance. This she did. The night was dark. There was snow, sleet, and rain. The green light of the Bourke having been lost in the collision with the Nester, there was great difficulty in finding her, as her red light was not visible. Neither did the Bourke use rockets or a torch to show her position. She had a high deck load of lumber, which helped to hide her cabin lights, and no masthead lights were burning. Finally the tug caught a glimpse of a cabin light, and ran in close enough to hail. Finding that the barge's long 1,200-foot tow line was dragging to windward, and realizing the danger of catching it in her propeller, she went around the stern of the Bourke, and came up to leeward, between her and the beach. A line was caught from the barge, and a tow line drawn aboard, which was made fast to her tow posts. The Bourke was then lying in the trough of the sea headed to the wind. The tug pulled her around, and was making for the harbor entrance, when the line slipped off the tow posts and the Bourke was again adrift. The tug drew 13 feet of water, and, on account of the shallowness of the water, deemed it dangerous again to go between the Bourke and the beach to get another line, even if time would permit, and returned to the harbor. Within a very few moments the Bourke ran on the beach; the men from the Schenk saying that they heard her strike while waiting to see if it was possible to again attempt her rescue before running for the harbor.

Two grounds have been urged for the condemnation of the Schenk: First, that the slipping of the line from the tow posts was due to a want of care and the proper degree of skill in fastening the line re-

quired under the circumstances; and, second, that it was wrongful negligence to abandon the Bourke after the slipping of the line without another attempt to get a line from her. The libel avers that the officers and crew of the tug "were careless and negligent and unskillful in that they did not place the tow line of the Bourke around or under the cleat or cavarel which crossed from one tow post of said tug to the other, and that by reason thereof said tow line slipped off the tow post and left the barge adrift." To support this they say that a tow line so fastened will not slip, and rely upon the fact of slipping to make a prima facie case against proper fastening. The libelant has also introduced certain admissions made by the master of the tug which tend to support this presumption—an admission made shortly after the event and upon the same night, and later repeated in evidence before the board of inspectors, that his linemen were inexperienced, and that the slipping of the Bourke's tow line had been due to this fact. That a tow line properly secured will not slip off of the tow posts is a reasonable presumption, and evidence of damages resulting from the slipping of the tow line, unexplained, makes a prima facie case of negligence. The Quickstep, 9 Wall. 665, 19 L. Ed. 767; Cincinnati, etc., Ry. Co. v. South Fork Coal Co., 139 Fed. 528, 71 C. C. A. 316, 1 L. R. A. (N. S.) 533; The Olympia, 61 Fed. 120, 9 C. C. A. 393; Memphis Electric Co. v. Letson, 135 Fed. 969, 68 C. C. A. 453; The Sweepstakes, Fed. Cases, No. 13,687; The Lyndhurst (D. C.) 129 Fed. 843; Burr v. Knickerbocker Steam Towage Co., 132 Fed. 248, 65 C. C. A. 554.

This prima facie case of negligence the defendants endeavor to meet, first, by the positive testimony of the master and the two linesmen on the Schenk, that the line was fastened in the manner alleged in the libel to be the safe and proper mode; second, by evidence of very unusual conditions The master of the Schenk says that he was standing with his two linesmen on the aft side of the tow posts, between the two posts. "We passed the line between the two tow posts, one turn and a half around the port tow post. I fetched the loose end of the line on the outside of the port tow post. We then ran the line under the cavil on the port side, and turned it right back on the port side of the port tow post, and finished winding it around that tow post with a right-hand turn; the first turn and a half being put on with a left-hand turn. After this was done, which is the usual way, and about all that is ever done in doing towing, harbor work, we still further, for the sake of absolute safety, took a heaving line that way lying on deck and was very nearly new, and stopped the end of the tow line." He adds, however, that he only started the operation of "stopping" the end of the tow line and gave direction to the linemen how to secure it with the heaving line, when his attention was called forward. Cater, one of the linemen, a man who had had an experience of four or five years as a seaman, testified to the same mode of fastening and both Capt. Benson, the master, and Cater, as experts, as to the mode being that usually used on tugs. It is plain that if Cater and Benson were green hands that any fault due to them, or either of them, was not as to the method, but in some want of skill or care in making the fastening in the mode used. Now, there is no

contradiction of the evidence as to the mode of fastening, and none tending to show want of skill or care in fastening according to that approved method further than a bare inference of such want of care or skill as results from the fact of slipping and the partially explained opinion of the master that the slipping was attributable to the greenness of his linemen. But this was only an opinion, and the fact of his having one or more inexperienced hands was explained as due to a strike, which compelled him to take the best men he could get. There is no expert evidence that a line secured in the approved method will not slip under any conditions. Upon the contrary, the men on the tug say that the line slipped at a moment when the Bourke was on the crest of a wave and the tug in a trough, that the tow line was too short, enough line not having been played out to the tug, and that in such a position the top coils slipped up and off the tow post so loosening the other coils under the cleats as to enable them to slip. But if we assume that the tow line was of the length claimed by the Bourke, and that, even under such conditions as those just mentioned, a line should not slip if it had been properly and skillfully fastened by the method ordinarily used, is the mere fact that the line was not secured as skillfully as it might have been enough to condemn the Schenk under the conditions which existed? This involves the measure of skill and care due from the Schenk to the Bourke. The learned judge below, who has had much experience in admiralty causes, was of the opinion that the service of the Schenk was a salvage service, and not a mere towage contract, and that, in the absence of willful misconduct or gross negligence resulting in some affirmative injury to the Bourke, the tug should not be held responsible. The mere fact that the Schenk was a harbor tug engaged in the usual work of assisting vessels in and out of Marquette harbor does not determine the character of her service upon this occasion. It is true that, when the Schoolcraft was some half mile off the breakwater, she whistled for a tug. But before the Schenk came out her stern barge had gone adrift, and was helplessly drifting ashore. Under these conditions the Schenk, when along side, was requested by the Schoolcraft to go outside and assist a tow in dire distress. The storm was furious, the wind and sea extraordinarily high, and the Bourke steadily drifting on ashore, which was less than one-half mile distance. There was no anchorage ground, and her single remaining anchor, which was put down after her hawser slipped, dragged. Both the master of the Schoolcraft and of the Bourke agree in saying that without the aid of the Schenk she was inevitably bound to go ashore when the Schenk went to her aid. That the Schenk went to her rescue upon a call or request for help, there being no pretense of an effort to agree upon terms, does not exclude salvage under such conditions. The Rhodes, 82 Fed. 751, 27 C. C. A. 258.

It is the peril of the vessel saved and the circumstances under which assistance was rendered which determines whether the service was salvage service or not. Every condition was here present upon which an award for salvage would depend except success. The Rescue v. The George B. Roberts (D. C.) 64 Fed. 139; The City of Puebla (D. C.) 79 Fed. 982; The Reward, 1 Wm. Rob. 177; The Princess

Albia, 3 Wm. Rob. 138; McConnochie v. Kerr (D. C.) 9 Fed. 50, 53; The Emily B. Souder, 15 Blatch. 185, Fed. Cas. No. 4,458; The J. C. Pfluger (D. C.) 109 Fed. 93, 95; The Flottbek, 118 Fed. 954, 55 C. C. A. 448. In McConnochie v. Kerr, Brown, District Judge, said:

"A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress of danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger."

But an actual contribution toward the saving of something is an essential to salvage, and here the effort of the Schenk was unsuccessful. This fact would deny her salvage. But does it follow because her attempt to assist in the salvation of the Bourke was not attended with success that she is to be condemned for her loss, even though her efforts were not guided by the best skill and her management not above criticism? A salvor comes under an obligation to use reasonable care for the protection of rescued property, and may lose all right to salvage award, or even render herself affirmatively liable for an independent injury sustained after a successful salvage service. The Mulhouse, 17 Fed. Cas. 962; Serviss v. Ferguson, 84 Fed. 202, 28 C. C. A. 327; The Henry Steers, Jr. (D. C.) 110 Fed. 578, 582; The Bremen (D. C.) 111 Fed. 228; The Duke of Manchester, 2 Wm. Rob. 471; The Neptune, 1 Wm. Rob. 297. No distinguishable injury is attributable to the Schenk. The Bourke was a lost vessel unless the Schenk could save her. She failed. The Bourke's loss is attributable to the Schenk only in the sense that her voluntary effort to help her was not efficient. That she went out with green linemen may be true; but she could do no better. Her going inefficiently equipped in that respect did not prevent the Bourke from getting a better service from some other source. The master of the Schoolcraft, her towing steamer, was helpless in the situation, and confesses that he could not have assisted her. There was no other tug in the harbor at all able to face such a sea and wind. That under such circumstances the master of the Schenk went to the rescue, although not properly manned in respect of skillful linemen, is not to be charged against the Schenk. The Henry Steers, Jr., cited above; The Dygden, 1 Notes of Cases, 116. In the Dygden Case, cited above, the rescue was attempted by persons not having the knowledge of seamanship required when there were others ready to render the services having proper skill and equipment. In the opinion it was said:

"When persons offer their services to vessels in distress, and there are no other individuals on the spot capable of rendering more efficient assistance, this court must look with considerable indulgence at their efforts, because, being the only aid that can be procured, and offered in a state of great exigency, every allowance must be made if they are not possessed of adequate knowledge to perform the duty they have undertaken. But different considerations will apply to the conduct of individuals who assume the character of salvors, when there are persons competent to discharge those duties."

The aid of the Schenk was given under conditions of great emergency when no other aid was possible. There is no suggestion of bad faith or willful misconduct. The most that can be made out is that a

tow line slipped, which might have been fastened more securely. But this slipping was not due to neglect to adopt the usual method of making such a fastening, but to some want of skill or care in making the fastening as secure as it might have been. But the circumstances under which this fastening was made require that indulgence shall be exercised. Great haste was necessary. The night was black. The deck and tow posts were covered with thin ice. The tug was rolling and pitching. At least one of the linemen was green, and the master was called away by other duties before the fastening could be completed. There was no gross neglect. At most, the negligence in this matter was slight and not enough to condemn the Schenk as having proximately caused the loss of the Bourke.

When a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salving vessel. This is as far as the reported cases seem to go. The Henry Steers, Jr. (D. C.) 110 Fed. 578, and cases there cited. But when, as here, liability is sought to be fastened upon a salving vessel solely because the attempted service was ineffectual, no independent injury having been caused by the salvor, there is no responsibility if the service was rendered in good faith, without clear evidence of culpable negligence or willful misconduct. The Henry Steers, Jr. (D. C.) 110 Fed. 578; The Laura, 14 Wall. 336, 20 L. Ed. 813; The Infanta Maria Theresa, 188 U. S. 283, 289, 23 Sup. Ct. 412, 47 L. Ed. 477.

Salvage service in the public interest should be encouraged. A decree against the Schenk, under the circumstances, would tend to discourage such efforts.

The decree of the court below will be affirmed.

NOTE.—The following is the opinion of Swan, District Judge, on hearing in the trial court:

SWAN, District Judge. In form and structure this is a libel for negligent towage. It impleads the tug "in a cause of damage civil and maritime" for alleged derelictions in the performance of a towage service which the tug undertook to render to the schooner Mary N. Bourke about 1 or 2 o'clock a. m. of April 26, 1902, near the entrance of the harbor of Marquette, Mich. There are eight specifications of fault charged against the tug upon which her liability is predicated for the damage occasioned to libelants as owners of the Mary N. Bourke by reason of the damage done to that vessel by the alleged misfeasance and nonfeasance of the S. C. Schenck. On the theory of the libel the fourth, sixth, seventh, and eighth specifications comprise the gravamen of the case pleaded. These are:

"Fourth. That by reason of the damage of said barge, Mary N. Bourke, as aforesaid, the costs and expenses necessarily incurred in the unloading of a portion of her said cargo, and in the employment of the said wrecking tug Favorite, her crew and outfit, and the service by her performed, and the releasing of said barge, and towing her into Bay City, and the making of general repairs occasioned by said stranding, the reshipment of said cargo in other vessels to its point of destination, the damage thereto, the deprivation of the profits and earnings of said barge, which would have otherwise accrued to these libelants. These libelants have sustained damage to the amount of $15,000 and upwards."

"Sixth. These libelants charge as negligence and faults upon the part of said tug, her owners, and those navigating her and have her in charge, in addition to such negligence and faults as may appear upon the trial of the cause, of which these libelants pray the advantage as follows: (1) That the said tug

*was not properly manned and equipped.* (2) That the officers and crew of said tug were incompetent. (3) That the officers and crew of said tug were careless and negligent, in that they did not properly fasten the tow line of said tug. (4) That the officers and crew of said tug were careless and negligent, in that they fastened the tow line of said barge Bourke in an unskillful and unseamanship manner. (5) That the officers and crew of said barge were careless, negligent, and unskillful, in that they did not place the tow line of said barge Bourke around or under the cleat, or cavarel which crosses from one tow post of said tug to the other tow post, and that by reason thereof said tow line slipped off said tow post, and left the said barge Bourke adrift.

"Seventh. That the officers and crew were careless and negligent and violated their duty as to said barge Bourke, by abandoning the same, and in that they did not make any effort to get a line to or from her after the tow line had slipped from the said tug's tow post.

"Eighth. In that those on said tug who made said tow line fast thereon were inexperienced, and not competent to perform the duties which they undertook, under the order of the officers of said tug."

Condensed, the facts pleaded are briefly: The steamer Schoolcraft on a voyage from Duluth and Ashland for Tonawanda, N. Y., towing in the order named the barges George Nester and Mary N. Bourke, all said vessels being lumber laden, and tight, staunch, and strong, and well tackled, appointed and appareled, encountered "a severe northeast gale" about 9 p. m. of Friday, April 25, 1902, when about 35 miles northeast of the port of Marquette. "The gale increased in velocity, and the sea became heavy, whereupon the master of the said barge Schoolcraft, for the purpose of the safety of the said steamer and the said barges and their cargo and crew, headed towards the port of Marquette for shelter," and about 12:45 a. m. of April 26, 1902, when about one-half a mile from the end of the breakwater of Marquette Harbor, the Schoolcraft sounded her steam whistle as a signal for a tug to come out and take the barges into port. The tug S. C. Schenk came out, and was ordered by the master of the Schoolcraft "to go to the assistance of the barge Mary N. Bourke and to tow her into said harbor." Obedient to this order, the Schenck immediately proceeded to the Bourke. At or about the same time the Schoolcraft signaled, as aforesaid, the tow post of the Nester, to which was attached the Bourke's tow line, broke and gave way, thus leaving the Mary N. Bourke adrift, and at the mercy of the northeast gale, which drove her rapidly towards the reef on which she was ultimately cast and wrecked. The Schenck reached the Bourke and took her line, which, it is claimed, was new and of strength and length sufficient to hold that barge under then existing conditions. The libelants charge that through the fault and incompetency of the Schenck's crew the line was not properly made fast on the tug and slipped after the Schenck had gotten the Bourke under way and before entering the harbor; that thereby the Mary N. Bourke was left helplessly adrift and in a dangerous position by reason of the close proximity of the beach and the existence of the high seas and strong winds which then prevailed, and which was blowing and drifting said barge Bourke towards the beach. It is alleged that there "was ample time and the conditions of said wind and sea was such that the said tug could have come about and again taken the line * * * and safely towed the barge into said harbor, and it was the duty of said barge to do the same." The tug thereupon returned to the harbor. Thereupon the Bourke dropped both anchors, which "partially held her for a time, but, the storm continuing, she soon dragged her anchors and went ashore, stem first, then swung around by reason of the force of the wind and the sea * * * which continued to roll in from the northeast to such an extent and with such force that the said barge pounded on the bottom, breaking her keelson frames, beams, and planks, and strained and warped the said barge, doing great damage thereto, * * * namely, the sum of ten thousand dollars." The total damages claimed for injury to the vessel, cost of repairs, unloading, and reshipment of cargo, and loss of profits and earnings of the barge are alleged to be "$15,000 and upwards." The quotations in the foregoing summary of the libel are taken from that pleading.

The answer of the claimant corroborates the libel as to the severity of the storm prevailing before and after the Schoolcraft's signal for aid was sound-

ed, and pleads that "the night was intensely dark. An unusually severe gale from the northeast was blowing at the time, accompanied at intervals by squalls of snow and rain, rendering navigation very difficult and dangerous, and making it impossible to see any distance out." The master of the tug learned from the life saving station by telephone of the coming of the tow—about 2 a. m.—and at once prepared to go to its aid or call, and on hearing the Schoolcraft's signal of four blasts went forthwith. Learning from the Schoolcraft that the stern vessel of the tow (the Bourke) had broken adrift and asked to go to her assistance, the Schenck went out at once, and, after some search in the darkness, her crew discovered the cabin light of the Bourke—the only light she showed—her green light having been carried away. The Bourke's tow line was still out and trailing from her, making dangerous the approach of the tug to her aid. The Schenck was to windward of the Bourke when the latter was first seen, and this compelled her, in order to avoid getting afoul of the tow line, to go under the stern of the barge and attempt to get the line from the latter's lee side. Claimant alleges that the line given by the Bourke to the tug was too short, and that the tug's linesmen or deckhands called in vain for more line. The gale was increasing in fury, and both tug and barge were drifting before it towards the breakers to the S. S. W. of the breakwater. Because of the urgency of the conditions, and without waiting for more line which the tug called for, the crew carefully fastened the line furnished, and started. Averring that the line was made fast in a seamanlike manner, claimant alleges that, when the barge's bow rose on the crest of the wave, the stern of the tug remained in the trough of the sea, and the tow line by this cause was pulled loose and over the tow post. The tug was instantly stopped and backed to recover the schooner's line, but before this could be done the Bourke was in the breakers of the lee shore, and apparently aground, and "it was unsafe, and, in fact, impossible, for the tug in that gale and terrific sea and under the conditions of weather then prevailing to get near the Bourke in her stranded condition, and the Schenck was obliged to leave her there and proceed to shelter in the harbor." It also "denies that it or the tug was under any legal obligation to perform the service of attempting to rescue and save said schooner Mary N. Bourke," and denies that it was or could be responsible for any of the things in said libel, even if the same were true, and insists that the libel does not set up facts sufficient to constitute a cause of action against said tug which was without fault; that the stranding was caused wholly by the unusual weather conditions and the faults of the Bourke specified in the answer, viz., failure to show lights, incompetency of her watch, failure to give notice of her whereabouts, negligence in letting her tow line drag, failure to drop her anchors before coming to the tug, and the failure to give the tug enough line to permit the same to be fastened effectually on the tug's tow post. The proofs show that the storm was of extraordinary violence and the sea unusually heavy. The Bourke's master testified that the velocity of the wind was 65 miles per hour. The records of the Weather Bureau show that it reached 75 miles per hour. The Bourke's high deck load of lumber greatly increased her drift before the gale.

She had lost her green light in collision with the Nester—apparently largely occasioned by the tempestuous conditions—before the tug came out. Nothing was furnished to supply its place. In the heavy fall of sleet and snow and the darkness it was impossible to locate the Bourke without search. Her tow line, several hundred feet in length, was trailing from her bow and astern of her—a dangerous menace to the tug's approach and to be avoided with unusual care, as its entanglement in the screw of the tug meant the latter's disablement and almost certain wreck. The Schenck was the only tug at Marquette which could dare to venture out in the storm. There was no other tug there seaworthy, for the perils of that navigation. It also appears from the proofs of both parties that there was a strike then in force among the deckhands and firemen; that because of that the Schenck was deprived of the services of her usual crew, and could obtain only inexperienced men to fill their places. The Schenck was under no obligation to venture out that night—owed no duty to the Bourke unless one was cast upon her effort to rescue her. Had the Schenck declined to attempt it, stranding and wreck of the Bourke was inevitable. The master of the Schoolcraft admitted that his

steamer was powerless to save the helpless barge, and that the only hope the vessel had was from the tug. The master and mate of the Bourke made a like admission.

If in making the attempt to save the barge the tug was under the ordinary obligations of the towage contract, she was bound only to use ordinary care and skill in the service. While such care and skill is a relative term and varies with conditions, and while the tug would ordinarily be bound to provide a competent crew for the service she undertakes, and the slipping of a tow line in ordinary towage might, if causing injury to the tow, be prima facie evidence of negligence, it would be a harsh measure of responsibility to hold her liable (when competent linemen could not be procured) for the slipping of a line fastened under such unusual and dangerous conditions as then prevailed, or for giving up further attempt to rescue the vessel at the hazard of her own safety. The Clematis, Brown's Admiralty, 499. But the service which the Schenck was called upon to render was more than mere towage, although its performance would have involved the necessity of towing the barge, if reasonably possible, away from the lee shore. It had every element of a salvage service except that of success. All the conditions were present which would heighten the tug's reward had she succeeded. No decision has been cited from the American or English courts making an unsuccessful attempt to salve property from an impending peril as cause of action against the persons or the property of the owner or master of the vessel which fails in the attempt. In the English courts the utmost liability entailed by the negligence of a salvor in the rescue of vessel or cargo is the diminution or denial of compensation. The Yan Yean, 5 Aspinwall's Marine Cases, 135; The Cheerful, 5 Asp. 525; Kennedy's Law of Civil Salvage, p. 36; The Duke of Manchester, 4 Notes of Cases, 580; The Lockwood, 9 Jurist, 1017. In the federal courts there are cases which affirm that the service of a tug under like conditions to those in evidence in this case are salvage services (The Rescue v. Roberts [D. C.] 64 Fed. 139; The City of Puebla [D. C.] 79 Fed. 982), and deny or reduce salvage for negligence or misconduct.

It is only culpable negligence proximately resulting in injury to the vessel that warrants action against one attempting to save her. The Harry Steers, Jr. (D. C.) 110 Fed. 587, 588. This case distinguishes between want of ordinary care and skill and culpable negligence, and fully reviews the authorities. It seems to be a fair conclusion from the authorities that it is only where a salvor has rescued the vessel from the primary peril to which she was exposed, and has deliberately or by gross negligence subjected her needlessly and recklessly to injury from a distinct and independent peril, that he loses the character of a salvor, and becomes affirmatively a wrongdoer. It is enough to protect the salvor that he has used reasonable care in his efforts, and a loss subsequently occurring cannot be visited upon him. It would be an extraordinary proposition that a tug attempting the rescue of a vessel in the very jaws of shipwreck should be held liable for even an error in the effort. The Laura, 14 Wall. 342–344, bottom of page.

Upon a careful consideration of all the facts, I am compelled to hold the libelants have failed to make a case against the tug, and that the loss was attributable solely to the conditions, and that the libel must be dismissed, with costs.