## KING v. RED STAR TOWING & TRANSPORTATION CO.

District Court, E. D. New York.
Jan. 10, 1931.

William F. Purdy, of New York City (John E. Purdy, of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Paul Tison, of New York City, of counsel), for respondent.

INCH, District Judge.

Libelant King brings this suit against the Red Star Towing & Transportation Company to recover alleged damages which he asserts was sustained by his coal boat Mifflin through negligence on the part of said respondent. The respondent denies any such negligence. The issue is one of fact.

The allegations of the libel assert, in substance, that respondent agreed with libelant to tow the Mifflin from the College Point Drydock & Supply Company's yard, Long Island, N. Y., to a berth alongside of a boat known as 1–K at Luckenbach Basin, N. J., and that respondent, instead of doing this, "left the 'Mifflin' hanging on a line at the pier head at Luckenbach Basin with her stern projecting out into the Hudson River," in spite of the fact that respondents' tug captains were there warned of the danger, and that, when the tide fell, the Mifflin "rested on a submerged bank" which caused "her stern to drop" below the surface of the water, causing her to sink and sustain the damages complained of.

The specific faults alleged are that respondents "failed to place the Mifflin in a place agreed upon, that she was left in a dangerous and exposed place without anyone to care for her. That the captains of the tugs did not heed the warning at Luckenbach

Basin. That the Mifflin was not placed in a place of safety."

At the trial the sole witnesses for libelant were King, who was not present at the time of the towing, and a Marine surveyor who subsequently surveyed the Mifflin but who had never seen the Mifflin before.

■ The burden of proving the negligence of respondent rested upon libelant. Aldrich v. Penn. R. Co. (C. C. A.) 255 F. 330.

Libelant's testimony fell far short of the allegations above set forth. In fact, it would not be difficult to find that libelant failed to sustain the burden of proving any damage to the Mifflin directly caused by any act of respondent.

However, it is not necessary to rest this decision on any such finding, for libelant has likewise failed to prove, by a fair preponderance of evidence, that respondent was guilty of any negligence.

■ The mere fact that the Mifflin sunk some time after she had been tied up, and the tugs had departed, is not sufficient to prove negligence. Aldrich v. Penn. R. Co. (C. C. A.) 255 F. 330, 331.

The facts, as I find them to be, are that some time in August, 1926, King brought over to the College Point dock his coal boat Mifflin. She had been damaged in some way on her port side forward, "10 or 15 feet back from her bow about 7 feet above light water mark."

King says he wanted some place to lay her up for repairs, but there is nothing to indicate any such repairs. He made an arrangement by which he was to pay some sum, not indicated, for wharfage, payable monthly.

When the northeast wind came the swells would break over her.

King allowed her to remain in this place from August, 1926, to December, 1927, when the respondent notified King to take her away.

During all this time King says he paid the monthly wharfage bill and it is plain that he knew the situation.

In December, 1927, therefore, and when respondent notified King to take her away, the Mifflin was in a condition which can readily be imagined from her unrepaired damage previously sustained before she came to respondent's dock, and from the ordinary wear and tear produced by the circumstances above stated during a period of more than a year.

On December 20, 1927, an oral agreement was entered into between respondent and King which, in substance, was as follows: The respondent told King that it would tow the Mifflin, free of charge, if he would find some other place within reason around the harbor. King said to take the Mifflin to Luckenbach Basin, N. J. Respondent said that this would be all right and for King to have a man on board the Mifflin the *following morning* (December 21).

King then replied that he couldn't "very well get a man out there." The respondent replied that then they would undertake the towage under such circumstances *without a captain, provided* King would have a man meet the Mifflin at Luckenbach Basin.

Later the same day King came back and asked if the respondent would put the Mifflin alongside of a boat called the 1–K. The respondent agreed that they would do so *"if we could get to it* but to be sure to have his man there to take charge of the boat." To this King agreed.

In these two conversations nothing was said about where the boat 1–K was actually lying at Luckenbach Basin, and so far as respondent was concerned it apparently relied entirely upon King to have his man there.

■ This tow service was performed without charge to King in order to get rid of the Mifflin. It does not seem to me, however, that this makes much difference for, having undertaken the towage, it was under the duty to use due care to perform it.

Accordingly, respondent that afternoon (December 20) gave an order to one of its tug captains to take the Mifflin to Luckenbach Basin and, if they possibly could, get it in alongside of the 1–K.

Captain Barber to whom this order was given is dead. Shultis, marine superintendent of respondent, was, however, an eyewitness to all that occurred, and from his testimony it appears that about 8 o'clock of the following morning (December 21) the Mifflin was pumped out, a canvass patch was placed over her damaged side, and two tugs, the Greenwich and the Flushing, one on each side, carried her safely over to Luckenbach Basin, where they arrived about 4 or 5 o'clock that afternoon. King failed to have any one at Luckenbach Basin.

His present excuse that he did not know when the boat was to be towed should not avail in view of his conversation of the previous day.

I have not overlooked the interest of witness for the respondent or of King which perhaps colors somewhat the testimony.

When they reached Luckenbach Basin, they found the slip was full of boats. They did the best they could and duly tied up the Mifflin fore and aft to a carfloat "about 25 feet inside the pier head line." It was the safest berth apparently available.

It subsequently appears that the boat 1–K had been lying back in the slip where there was only a foot and one-half of water, and that it would have been impossible for the tugs, drawing 9 feet, to have reached it. It was not accessible to the tugs when they arrived had they found it and King had no one present to point out where the 1–K was.

King now claims that they should have pulled the Mifflin in by hand, but it is apparent that up to that time he had paid little attention to the matter. In fact, even after he was informed, the following day, that the Mifflin was sunk, he did not go over, but says he sent a man named Perry. The latter was not called as a witness.

Finally King did himself go over.

If Perry did go over, what he did is speculative, for, according to a witness, the Mifflin, when she was examined after her submersion, was not in the same position in which the tugs had left her. It is entirely possible that Perry or others had moved or attempted to move the Mifflin after the departure of the tugs.

However, this also would not excuse the respondent if its tugs had been careless in their selection of a proper berth.

The only eyewitnesses to such selection are witnesses for respondent. King was not present. He had no one there to represent him. Perry was not produced as a witness. Two days elapsed between the tying up of the Mifflin and the visit of King.

The proof of the respondent therefore shows that the tug captains exercised reasonable care and skill under the circumstances to place the Mifflin in as safe a berth as they could at Luckenbach Basin.

She had been safely towed a long distance from Long Island to New Jersey, and she had been safely placed as near as conditions permitted to her designated berth. Schoonmaker-Conners Co. v. New York Tidewater Corp. (C. C. A.) 11 F.(2d) 470; The Milton (C. C. A.) 235 F. 287.

The only duty resting on respondent was to take the Mifflin to a reasonably safe berth and, she having no captain on board, to tie her up in a seamanlike manner. The Britannia (C. C. A.) 252 F. 583.

Libelant has failed to prove that this did not take place. On the contrary, respondent's testimony shows that it did. The Willie (C. C. A.) 184 F. 279.

As I have said, the testimony for respondent indicates that the damage now claimed was the same as the Mifflin had sustained prior to the towage. "She looked the same to me as she did when we towed her. There was no change." (Shultis.)

If respondent was without fault in placing her at her berth, the subsequent cost of raising her, to get her out of the way, cannot be charged to it.

For the foregoing reasons, therefore, it seems to me evident that, aside from the fact of failure to sufficiently show damage, libelant has failed to prove, by a fair preponderance of evidence, that respondent neglected any duty resting upon it under the circumstances.

Libel dismissed, with costs.