## P. DOUGHERTY CO. v. UNITED STATES.

## STEAMTUG BARLOW CORP. v. UNITED STATES.

Nos. 1654, 1670.

United States District Court
D. Delaware.
March 7, 1951.

Thomas Herlihy, Jr., of Wilmington, Del., and Henry C. Eidenbach (of Hagen, Senecal & Eidenbach), of New York City, for libelant Steamtug Barlow Corp.

Francis A. Reardon, Asst. U. S. Atty., of Wilmington, Del., and T. F. McGovern, Department of Justice, Washington, D. C., for respondent, United States of America.

RODNEY, District Judge.

This opinion is concerned with two cases, The P. Dougherty Company v. United States of America, No. 1654 in Admiralty, and Steamtug Barlow Corporation v. United States of America, No. 1670 in Admiralty, which were consolidated for purposes of trial.

In the first of the above named actions the libelant seeks to recover for damage suffered by the barge Harford on April 23, 1947, allegedly by reason of the negligence of the Coast Guard Cutter Mohawk. It is averred in the libel that The P. Dougherty Company is the owner of the barge Harford; that on April 22, 1947, the barge Harford was in tow of the tug Barlow, en route from Rockland, Maine, to Hampton Roads, Virginia; that when the tow was in the neighborhood of Fenwick Island, the Barlow's towing hawser parted and another barge in tow of the Barlow collided with the Harford. It is further alleged that the Coast Guard Cutter Mohawk subsequently arrived alongside the Harford and thereafter took it in tow for Delaware Breakwater, and that while proceeding into Delaware Breakwater the Mohawk brought the starboard side of the Harford into collision with the breakwater with the result that the Harford grounded on the breakwater, sustaining damage. The damage is alleged to be due to fault, neglect and want of care on the part of the Mohawk and to have amounted approximately to the sum of $50,000.

In the other case, that of Steamtug Barlow Corporation v. United States of America, a contingent claim is asserted. This claim arises out of a libel which was filed in the District Court for the Eastern District of New York by P. Dougherty Company against the tug Barlow for damages sustained by the Harford as a result

Edward W. Cooch, Jr. (of Morford, Bennethum, Marvel & Cooch), of Wilmington, Del., and Christopher E. Heckman (of Foley & Martin), of New York City, for libelant, P. Dougherty Co.

of its collision with the barge, Gordon C. Cooke, which was the other barge in tow of the Barlow, and the subsequent grounding on the Delaware Breakwater. In that suit, the Steamtug Barlow Corporation claimed the tug Barlow and filed an answer on its behalf. It also filed a petition to implead the United States of America in that action. However, the United States of America did not appear in that action, contending that it was not subject to the venue jurisdiction of that court. Thereafter the Steamtug Barlow Corporation filed its libel against the United States in the District Court for the District of New Jersey, asserting a contingent claim against the United States for the damage alleged to have been caused by the Mohawk, for which damage a claim had been included in the Dougherty Company's action against the Barlow in the Eastern District of New York. Upon the motion of the United States, this action was transferred to the District of Delaware, and by stipulation of the parties was consolidated for trial with the case of The P. Dougherty Company v. United States.

There is little dispute among the three parties regarding the main facts which are pertinent to both suits. The court's findings with respect to them are set out in its Findings of Fact and Conclusions of Law which are filed contemporaneously with this opinion. The chief differences between the parties relate rather to the conclusions to be drawn from the facts, and to the ascertainment of the proper legal principles for establishing the duty owed by the Coast Guard Cutter Mohawk to the Harford. A brief restatement of the facts will, however, be necessary to a better understanding of these questions.

The barge Harford is a wooden vessel without motive power of her own, having a length of over 250 feet, and a gross tonnage of over 2,000 tons. She is a coastwise vessel, and during the voyage with which these suits are concerned, carried a crew of three, that is, a master and two ordinary seamen.

On April 17, 1947, the tug Barlow, which was owned by the Steamtug Barlow Corporation, took the Harford in tow at Sears-port, Maine. The Harford was light and was to be taken in that condition to Hampton Roads, Virginia. The tow proceeded to Rockland, Maine, where the barge Gordon C. Cooke was added to the tow. The Gordon C. Cooke was loaded. The tow then proceeded down the coast without particular incident until on the early morning of April 22, 1947, the towing cable between the Barlow and the Harford parted. At that time the weather was stormy, with strong winds blowing and seas rough, which conditions had existed for some time prior to the happening of the accident. While the two barges were thus adrift, they collided and as a result the Gordon C. Cooke sank, and the bow of the Harford was damaged. The Barlow informed the Coast Guard at Cape May, New Jersey, of the situation by radio-telephone and was told that a vessel would be sent by the Coast Guard to stand by and render assistance. The Barlow then proceeded to Lewes, Delaware, with the rescued crew of the Gordon C. Cooke on board. The Harford was left at anchor at the approximate position of the collision between the barges, that is to say, in the general vicinity of Winter Quarter Lightship to the south of Cape Henlopen.

Shortly after the request for assistance had been received the Coast Guard Cutter Mohawk left Cape May, in order to assist the Harford. Owing to the fact that the position of the Harford had been incorrectly reported by the Barlow, she was not sighted by the Mohawk until some time in the afternoon. Having found the Harford, the Mohawk stood by for the rest of the day. Early on the following morning the Mohawk made preparations for taking the Harford in tow. The Harford had considerable difficulty in raising its port anchor, but eventually succeeded in getting it up onto the deck by makeshift methods. At about midday the Mohawk got under way with the Harford in tow, making for the Harbor of Refuge, at the entrance to Delaware Bay, in accordance with instructions from the Search and Rescue Center at Cape May.

The Mohawk proceeded up the coast with the Harford in tow, reaching the vicinity

of Overfalls Lightship, off the entrance to Delaware Bay, in the evening. The Mohawk then stopped and shortened the hawser, after which she got under way again and headed at slower speed for the Harbor of Refuge, just inside the entrance to Delaware Bay. At this time the weather was clear, with reasonably good visibility. The force of the wind had somewhat abated. It was flood tide, and the flood current had a velocity of about one and a half to two knots, setting in a northerly direction.

The entrance to the Harbor of Refuge lies between Cape Henlopen on the south and the southerly tip of the Harbor of Refuge Breakwater on the north. As originally planned, the course of the Mohawk was expected to pass midway between these two points. The distance between Cape Henlopen and the southerly tip of the breakwater is about eight tenths of a mile. Thus the Mohawk was originally expected to pass about two thousand feet from the end of the breakwater. It appears, however, that as the Mohawk approached the Harbor of Refuge, an unidentified vessel was sighted inside the Harbor. According to the testimony of those who were in charge of the Mohawk, it was believed that this vessel was in such a position, in or near the entrance to the Harbor of Refuge, that it was necessary to alter the Mohawk's course so that she would pass between the unknown vessel and the southerly end of the breakwater, thus steering a course appreciably closer to the end of the breakwater than had at first been planned. It was apparently also believed that both of the Harford's anchors were unusable and that for that reason it would be necessary to circle around the anchored vessel inside the Harbor of Refuge until the Barlow or some other tug could come alongside and take the Harford in tow. The Mohawk had been proceeding at slow speed, apparently in order that the contemplated circling maneuver might be carried out safely.

However, it soon became apparent that the Mohawk was being set off her planned course to the right, that is to say, in a northerly direction. Several changes in course to the left were then made, and her engine speed was increased, but these actions were of no avail, and shortly thereafter the Mohawk came into collision with the southerly end of the breakwater. The hawser from the Mohawk to the Harford was immediately cut in accordance with the orders of the Mohawk's commanding officer, and the Mohawk moved away from the breakwater, apparently undamaged. The Harford was still outside the Harbor of Refuge, and she swung around so that her starboard side hit the breakwater at a point above the light on the southerly end. She remained there for some time, broadside to the breakwater, pounding against the breakwater. Subsequently, the Harford was taken in tow by another tug, the Jack, which removed her from the breakwater and took her up Delaware Bay, and eventually beached her on Joe Flogger shoal.

Such are the basic facts in these two cases. In its argument on these facts the government has raised the question of the duty owed by the Mohawk to the Harford under such circumstances. This presents a question of law, the determination of which is important, if not essential to the disposition of the suits.

On the one hand the two libelants have taken the position that the Mohawk was negligent in the manner in which it attempted to bring the Harford into the Harbor of Refuge, and that such negligence, even though simple negligence, is sufficient to impose liability on the respondent. On the other hand, the government contends not only that there was no negligence, but that even if there was negligence, that in itself is not enough upon which to predicate liability. It urges strongly that there must be clear proof of wilful misconduct or of gross and culpable negligence, if liability is to be imposed upon it. The litigation draws additional interest from the fact that it is the first known instance of an action based on the negligence of the Coast Guard.

The government bases its contention as to the degree of care which was required of the Mohawk, on the gratuitous nature of the service rendered by her. It seems

not to be disputed that the services rendered by the Mohawk to the Harford were in fact gratuitous. It seems further to be the case that services of this nature are always rendered by the Coast Guard without expectation of or demand for compensation. Such services, the government contends, are simply in the nature of gratuitous assistance, and are to be distinguished from towage or salvage services, and even if the services themselves are the same as or substantially similar to the latter, liability can only be predicated upon gross negligence or wilful misconduct.

■■ Towage has been defined as the employment of one vessel to aid in the propulsion or to expedite the voyage of another, when there is no circumstance of peril, such service being rendered pursuant to a contract.[1] Salvage service has been stated to be a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress of danger either present or to be reasonably apprehended.[2] Both towage and salvage services are normally performed for compensation or for a reward. Indeed, salvage is, properly speaking, the reward or compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril on the sea.[3]

■ With respect to the standard of care and skill required of a tower, it appears that according to the weight of authority only reasonable caution and skill are ordinarily required.[4] In the case of a salvor, the most authoritative statement of the applicable rule seems to be that of Judge Lurton in The S. C. Schenk, 6 Cir., 158 F. 54, 59, in which he said: "A salvor comes under an obligation to use reasonable care for the protection of rescued property, and may lose all right to salvage award, or even render herself affirmatively liable for an independent injury sustained after a successful salvage service. * * *

"When a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may be not only forfeiture of all right of salvage, but an affirmative award of damages against the salvage vessel. This is as far as the reported cases seem to go. The Henry Steers, Jr. (D.C.) 110 F. 578, and cases there cited. But when, as here, liability is sought to be fastened upon a salving vessel solely because the attempted service was ineffectual, no independent injury having been caused by the salvor, there is no responsibility if the service was rendered in good faith, without clear evidence of culpable negligence or willful misconduct. * * *"

This rule was apparently followed in Dorrington v. City of Detroit, 6 Cir., 223 F. 232, 241, and in the more recent case of The Cape Race, 2 Cir., 18 F.2d 79, and from it I deduce the general principle that a salvor is held to the exercise of reasonable care in the rendering of his services. The use of the term "culpable negligence" in Judge Lurton's opinion does not, in my opinion, necessarily mean "gross negligence," but rather a failure to exercise the degree of care which had previously been specified in his opinion, namely, reasonable care.

Having thus briefly considered the principles which appear to be applicable to towage and salvage services, it is necessary to determine whether or to what extent those principles may be applicable in the present case. As has been observed, the services of the Mohawk were rendered without direct compensation either to her crew or to the United States. This fact is, I think, sufficient to distinguish them from true towage or salvage services. But it does not necessarily follow that in rendering such services the Mohawk was under some different or lesser obligation to exercise reasonable care. The broad authorization for the performance of such

---

1. Stevens v. The White City, 285 U.S. 195, 200, 52 S.Ct. 347, 76 L.Ed. 699; The S. C. Schenk, 6 Cir., 158 F. 54, 59; 48 Am.Jur. 336.

2. Stevens v. The White City, supra; The S. C. Schenk, supra.

3. The Blackwell, 10 Wall. 1, 12, 19 L. Ed. 870.

4. 48 Am.Jur. 343.

services by the Coast Guard appears to have been given by R.S. 1536, as set out in the footnote.[5] The United States has thus assumed the burden of maintaining public vessels for the purpose, in part at least, of giving assistance to "distressed navigators." The government, however, contends that the services of the Mohawk should be considered as analogous to gratuitous assistance given by a privately owned vessel, and that the standard of care required of the latter should be less than that required of a salvor who acts in expectation of receiving a liberal salvage award.

No authority or precedent has been cited or found regarding the duty of a privately owned vessel giving gratuitous assistance to another. If we turn to the common law for guidance, we find that certain general principles are reasonably well established. Generally speaking, even a volunteer is liable, under the common law of torts, for an injury negligently inflicted on the person or property of another. As Justice Cardozo said in Glanzer v. Shepard,[6] "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." In other words, the mere fact that the services are rendered voluntarily and without expectation of reward does not relieve the actor of the duty to exercise some degree of care.[7] The general principle, as already stated, is that even a volunteer may be held liable not only for misconduct in rendering the services which he has undertaken to render, but also for negligence, to some degree at least.

■ This general principle seems to have been applied to towing cases,[8] in admiralty. If gratuitous assistance were rendered by a privately owned vessel in circumstances of emergency and danger, it might be proper to excuse a want of skill or competence, but to condone a failure to exercise with reasonable care such skill and competence as was possessed would seem to go beyond what may be required by the policy of maritime law to encourage the humane impulse to succor those in distress on the high seas. In the present case, however, the analogy to a privately owned vessel rendering gratuitous assistance is not, in my opinion, entirely complete. The maintenance of such vessels as the Mohawk is undertaken by the government pursuant to statutory authority and at public expense. The services of such vessels are rendered, properly speaking, to the public and not simply to the particular vessels or persons who are rescued or assisted from time to time. The Mohawk was prepared and equipped, in part, at least, to render assistance to vessels in distress. Under these circumstances I am of the opinion that such a vessel must be held to answer for damage which results from her failure to exercise with reasonable care the skill and competence which her crew possess or may reasonably be expected to possess, which would, at the least, be ordinary skill and competence in the performance of such duties.

Such being my conclusion with regard to the basic legal question, consideration must now pass to the question whether under the facts the respondent is liable for the damage allegedly done to the Harford while she remained alongside the Harbor of Refuge Breakwater.

■ The collision of the Mohawk with the Harbor of Refuge breakwater and the subsequent running of its tow, Harford, alongside and against the breakwater are uncontroverted facts. It is a well-established principle of admiralty that where a

---

5. Formerly 14 U.S.C.A. § 53, the substance of which now appears in 14 U.S.C.A. §§ 88 and 93(a): "The President may, when the necessities of the service permit it, cause any suitable number of public vessels adapted to the purpose to cruise upon the coast in the season of severe weather and to afford such aid to distressed navigators as their circumstances may require; and such public vessels shall go to sea fully prepared to render such assistance."

6. 233 N.Y. 236, 135 N.E. 275, 276, 23 A.L.R. 1425.

7. See A.L.I. Restatement of Torts, Secs. 323 and 324.

8. The Deer, 7 Fed.Cas.No.3737; King v. Red Star Towing & Transportation Co., D.C., 48 F.2d 633.

moving vessel in a maneuverable space comes into contact with an immovable object, such as the breakwater or a vessel at anchor, there is cast upon the moving vessel the burden of showing that such collision was not the result of negligence.[9]

In addition to the fact that a moving vessel had come into collision with the immovable breakwater, with its attendant inferences and presumptions, it is contended that other express acts of the defendant have been shown which indicate a failure to use due care under the circumstances. It is undisputed that the distance from the point of Cape Henlopen on the south to the southerly end of the Harbor of Refuge breakwater is from 9/10ths of a mile to a mile, constituting the entrance to the Harbor of Refuge, and that this space was available to the Mohawk. It is uncontradicted that the usual and proper method of navigation upon entering the Harbor of Refuge on a flood tide with a drift to the north or northeast is to hold a course fairly close to Cape Henlopen. The necessity for this course would seem to be increased as the length and unwieldly character of a tow would increase the danger of the tow coming in contact with the breakwater. The Mohawk and tow did not hold close to Cape Henlopen, but set a course nearer to the breakwater, the exact course being somewhat uncertain. On May 1, 1947, a few days after the accident, the commander of the Mohawk reported, "plans were made to enter the Harbor of Refuge near the northern breakwater and circle to port within the harbor." At the trial this commanding officer testified "the course we laid favored the southern side. * * *" It seems to be true that the position of an unidentified vessel within the Harbor of Refuge had a bearing upon the plans and course subsequently pursued by the Mohawk. The exact location of this unidentified vessel is subject to some dispute, but it is in evidence that the presence of the vessel "should not have bothered an inbound vessel with a tow." Clearly the Mohawk intended to leave this unidentified

vessel to port and the breakwater to starboard and to circle in the Harbor of Refuge to deliver the tow which was then thought to be without use of her anchors. The Mohawk, from the time she was preparing to enter the Harbor, made a number (7 or 8) of changes in course to the southward at a time when she was proceeding under reduced speed. Regardless of the exact course pursued and of the exact times the courses were changed to the southward, I cannot avoid the conclusion that laying the course too close to the breakwater and failing to make proper allowances for the effect of wind and tidal flow were plain evidences of failure to use due care and were, at least, contributory causes of the accident. The weather was clear. The Mohawk was in possession of the necessary charts and data of tidal flow and the Mohawk made several pronounced changes in the course and to the left at a time too late to avoid the collision. The stark fact remains that a moving vessel under perfect control of its engines came, with its tow, upon a fixed and immovable breakwater on its starboard side when, upon its port side, lay almost a mile of maneuverable space in which the exercise of due care and a response to the usual and proper course of procedure would have placed it .

Notwithstanding the course pursued by the Mohawk and its effect as constituting a proximate and contributing cause of the accident, it is necessary to consider the manner of operation of the tow. The government contends that the accident was caused by the negligent action of the helmsman of the barge, Harford, in not following the course set by the Mohawk. It contends that the accident was caused by the erratic steering of the tow and that if the tow had been properly steered it would have followed the Mohawk to a place of safety. On the barge, Harford, was a captain and two other seamen. One of these was Norman Hill, the helmsman, and the other is not referred to except by name and does not appear at the trial or in connection with the case. Hill was a young man 18

9. The Cromwell, 4 Cir., 259 F. 166; Pennsylvania R. Co. v. Eastern Transportation Co., 6 W.W.Harr. 435, 36 Del. 435, 178 A. 580; The Clarence P. Howland, 2 Cir., 16 F.2d 25; The Severance, 4 Cir., 152 F.2d 916.

years of age. Hill was steering the barge at the orders of his captain. This captain was below deck attending to the pumps until almost the actual impact of the Harford upon the breakwater and could not testify as to the manner of steering of the barge. Hill did not appear at the trial and his whereabouts seem to be unknown to both the parties. Under these circumstances the plaintiff may not be charged with any inferences to be drawn from a failure to produce a material witness as was done in Jett v. Texas Co., D.C., 73 F. Supp. 699. It is true that the defendant has offered in evidence the substance of a conversation had with Norman Hill in which Hill is purported to have stated that when the Mohawk was attempting for itself and its tow to go to the left or port that he, Hill, on the tow had his rudder at "hard right." This testimony was properly objected to and is to be given no consideration by me. Hill was not the master of the Harford and but an ordinary seaman. No admission of his can operate in any way to bind the libelant.[10]

Not being an admission and thus admissible in evidence, the purported conversation is subject to all objections to hearsay testimony. Had I been at liberty to consider the effect of the supposed statement of Hill, it is quite possible that recourse need not then have been made to other sources. Without reference to the supposed statement of Hill, there is no evidence whatever from anyone in connection with the Harford as to the manner of its operation and reference must be made to extraneous testimony and the facts of the accident itself.

From one of the few disinterested witnesses, Captain Tracy of the pilot boat, we get a picture of the erratic course steered by the tow as she approached the entrance to the harbor. Captain Tracy was vigilant and it was his duty to watch all vessels, inbound and outbound. The Mohawk and tow passed across the bow of the pilot boat at some distance and at an angle. Captain Tracy states that the Mohawk always showed to the pilot boat a broad green or starboard running light plainly indicating that her course was, at least, consistent. The barge, Harford, however, showed to the pilot boat at various times the broad green starboard running light and also the broad red port running light showing clearly that the Harford was not closely following the Mohawk. The measure of difficulty in steering the barge is somewhat uncertain as the captain of the barge stated, "You don't have to steer a light barge. You follow, you just stand by at the wheel."

The culminating proof that the barge was not following the Mohawk, it seems to me, is shown by the position of the boats at the time of the accident. The hawser had been shortened from some 100 fathoms to 30 or 40. The Mohawk had never been north of the southern end of the breakwater. As the Mohawk neared the end of the breakwater, she changed her direction to port or left and found her steerage way had been destroyed and the Mohawk bumped the end of the breakwater. The Harford, on the other hand, did not get near the end of the breakwater. The Harford at all pertinent times remained outside of the breakwater and when about fifty yards from the breakwater, as expressed by the captain of the Mohawk, "The Harford took a northerly course almost definitely looking like she was going up the Delaware Bay outside the Harbor of Refuge. That counteracted all possibility of our pulling her more to the southward." The captain of the Mohawk made several estimates of the variance of the course of the Harford from that of the Mohawk. He stated that in approaching the harbor the veering of the tow was 10° or 15° and the last veer was about 20°. He also stated that, at the time of the impact of the Harford with the breakwater, her course was about 45° with reference to that of the Mohawk. The Mohawk then, as it was making the entrance, came in contact with the breakwater at its extreme southern end and the Harford was on the outside of the breakwater and some distance above the entrance. The hawser joining them extended around the end of the stone pile and was subsequently cut.

10. The Enterprise, 8 Fed.Cas.No.4497.

I am clearly of the opinion that the Mohawk was guilty of negligence in failing to use due care in the selection of a course that was sure to be a safe one. I am equally of the opinion that even the course adopted by the Mohawk would have been a successful one had the Harford followed in a proper manner.

The foregoing consideration has been confined to the period between the time when the Mohawk first took the Harford in tow and the time that the Harford became in contact with the breakwater of the Harbor of Refuge.

The damages must be divided and, if the parties cannot agree, must otherwise be ascertained.

An appropriate order may be submitted.

